**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John M. KING and A. Rowland Boucher,
Defendants-Appellants.**

**Nos. 1061 and 1062, Dockets 76–1435
and 76–1440.**

United States Court of Appeals,
Second Circuit.

Argued March 16, 1977.

Decided July 22, 1977.

Certiorari Denied Oct. 31, 1977.
See 98 S.Ct. 404.

Michael F. Armstrong, New York City (Warren H. Colodner and Barrett, Smith, Schapiro & Simon, New York City, on the brief), for defendant-appellant King.

Andrew J. Maloney, New York City (Norman Arnoff and Maloney, Viviani & Higgins, New York City, on the brief), for defendant-appellant Boucher.

John R. Wing, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., for the Southern District of New York, Paul Vizcarrondo, Jr., and Lawrence B. Pedowitz, Asst. U. S. Attys., New York City, on the brief), for plaintiff-appellee.

Before LUMBARD and TIMBERS, Circuit Judges, and DAVIS, Judge, Court of Claims.*

DAVIS, Judge:

After a six-week trial in the Southern District of New York before Judge Frankel and a jury, appellants John M. King and A. Rowland Boucher were convicted on an indictment charging four counts: one of securities fraud (15 U.S.C. § 78j(b)) and related counts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to commit those substantive offenses (18 U.S.C. § 371). King was sentenced to concurrent terms of one year's imprisonment on three of the counts, to be followed by three years of unsupervised probation on

* Sitting by designation.

the mail fraud count. Boucher's sentence was to seven months concurrently on three counts, and thereafter also to three years unsupervised probation on the mail fraud charge.

Since appellants do not challenge the sufficiency of the evidence we do not set it out in detail; the barebones will suffice for the most part. The main institutional actors in the case were King Resource Co. (KRC), a Denver-based public company primarily engaged in selling oil, gas and other natural resource interests, and the Fund of Funds (FOF), an open-ended Canadian mutual fund, Geneva-based, which was managed over-all through Investors Overseas Services (IOS), a Bernard Cornfeld company. King and Boucher were Chief Executive Officer and President, respectively, of KRC. In 1968 KRC (through King and Boucher) agreed with FOF to sell undivided interests in oil and other resource properties to FOF at a cost comparable to that charged KRC's other customers. During the next two years FOF became KRC's most significant customer, purchasing approximately $53,-000,000 in such properties. The main holding involved in this case was a 50 percent undivided interest in some 22 million acres of oil and gas permits (with the potential of becoming leases) in the Canadian Arctic, bought by FOF from KRC for about $11 million.

FOF periodically revalued its investments in order to determine their "net asset value" (for the sale and redemption of its shares) and to pay IOS, the investment advisor, which was entitled to a commission on any appreciation of FOF's assets. One way in which this kind of revaluation was accomplished was by a sale of a small portion of the particular FOF asset. In 1969, after King and Boucher had advised FOF that the Canadian Arctic oil-and-gas holdings had substantially appreciated, FOF decided to revalue that property and asked King to arrange such sales (on FOF's behalf) of 10% of the FOF interest; it was understood that the sales had to be bona fide and arms-length so that they could be used to ascertain the correct market value of FOF's Arctic interests. Thereafter, at the end of 1969, sales were arranged by King and Boucher for about $15 an acre, more or less—sales which appeared on their surface to be genuine. On the basis of these sales FOF's Arctic holdings were revalued very sharply upwards.

The core of the prosecution's case was that these sales, which seemed to be *bona fide* and arm's length, and were so represented by appellants, were collusive transactions in which appellants arranged to supply the purchasers with the funds to buy the property and also agreed to buy the permits back if the purported vendees so wished. The two sales on which the case centered and which the court's charge presented to the jury were one to John Mecom and another to Consolidated Oil and Gas Co. (COG).

For the Mecom sale—as to which the prosecution's proof was stronger—the Government's evidence supported the following indicators that the transaction was not a genuine one on which a proper revaluation of FOF's Arctic properties could be grounded (we use the summary which the court's charge gave the jury of the Government's contentions on this point):

(1) That Mecom would be assured of net cash receipts from business with KRC or with King-related companies in the form of drilling work in the Arctic or elsewhere sufficient to supply him with profits for the payments called for under his contract for that purchase of the FOF interests.

(2) That Mecom would be advanced by KRC or a King-related company the money needed to make the down payment of something in excess of $260,000.

(3) That Mecom would not be obliged to pay any .noney out of his own pocket other than moneys advanced to him by KRC or obtained by him from KRC to King-related companies.

(4) That King or a King-related company would at Mecom's request buy back the Arctic interests and hold Mecom harmless from any obligation to make the payments

that purported to be due under the sales agreement.[1]

Capping the fraud, in the Government's presentation, were 1970 letters to FOF's auditors, signed by both appellants, representing that the Mecom and COG sales were both arm's length and *bona fide,* that no buy-back agreements were involved, or any guarantee to the purchasers of the economic results of the transactions. These letters were written prior to FOF's revaluation of the property and as part of that process.

Defendants, who took the stand, denied that any of the arrangements they entered into with Mecom or COG was underhanded or lacking in full good faith, denied that there were any buy-back agreements integral to the sales as made, and asserted that any arrangements by which money was supplied to Mecom (or to COG) were pursuant to independent and legitimate business transactions, not designed as secret inducements or side-deals in connection with the

Arctic purchases by Mecom or COG. They maintained that the representation letters to FOF's auditors were not fraudulent but accurate characterizations of the Mecom and COG transactions.

Though appellants do not argue sufficiency, they insist that the prosecution's case was very thin, and that we must bear that in mind in appraising the various trial and evidentiary points urged upon us. Judge Frankel, on the other hand, writing on the defendant's post-trial motions, pointed out that "the jury's deliberations were notably swift. It seemed evident that the evidence for conviction was clear and overwhelmingly persuasive." He also found "the proof of guilt powerful to the point of near certainty," that "the court is convinced beyond a reasonable doubt, as the jury must have been to convict, that the defendants swore falsely at key junctures in their testimony," and that "the testimony of some 49 witnesses and the large volume of exhibits appear convincingly to justify as reliable and accu-

1. In greater detail, the prosecution's proof showed the following for the Mecom sale:

Late in 1969 King approached Mecom through Hulsey, a friend of Mecom's and a KRC employee. Hulsey testified that King told him to offer Mecom a buy-back arrangement for a sale of the Arctic interests but that Mecom was hesitant because of lack of liquid funds. Hulsey stated that in late December 1969 Boucher sent him to Houston with a sales contract for Mecom and explained that an additional agreement would be arranged later and would provide for a "repurchase agreement" and an "agreement to provide work." Hulsey told Marriott, Mecom's attorney, that Mecom would not have any personal liability, that payments under the sales contract would be made from profits earned by KRC employing Mecom's drilling rigs, and that if Mecom was unsatisfied, King would buy the interests back. The sales contract provided that Mecom was to pay $7.50 per acre cash plus an additional $7.50 per acre in work obligations for 347,883 acres (about 3 per cent of FOF's holdings). Mecom and Marriott did not want to sign the contract because it was a straight sales agreement, and did not contain Hulsey's guarantees. It was then agreed that Mecom would sign but that Hulsey would not release the contract until Marriott received a supplemental agreement incorporating Hulsey's promises. Hulsey testified that he then returned to Denver and that the contract was removed from his desk and was given to Boucher's secretary.

Lowry, KRC's general counsel, testified that after speaking with King, he prepared a letter agreement, an unsigned copy of which was sent to Marriott along with a note indicating that Lowry would retain the original, which had been signed by King. Lowry stated that he destroyed the original in January 1972, when his offices were moved. What was apparently Marriott's copy and the accompanying Lowry note were produced at the trial. The letter confirmed the sales contract, promised to provide sufficient payments to be made to Mecom to meet all payments on the sales contract through October 1971, and further provided that King would accept an assignment of Mecom's liabilities and interests under the sales contract any time between October and December 31, 1971.

Mecom's downpayment on the sales contract, approximately $260,000, was due on January 2, 1970. Boucher and Hulsey arranged, with King's authorization, to forward $275,000 to Mecom through a Colorado Corp. subsidiary (Colorado Corp. was a King-controlled company). On January 22, 1970 Marriott received a check for $275,000 and arranged for the proceeds to be used to cover the $260,000 downpayment. Appellants claim this money was an advance on an arrangement to use one of Mecom's drilling rigs. Mecom never received any drilling contracts from KRC (apparently because his equipment was unsuitable or unready).

rate the conclusions the jury declared it had reached beyond a reasonable doubt."

From the record as well as the written and oral presentations made to us, we have no reason to disagree with the trial judge's view that the Government's case was strong. It was based, in large part, on the direct testimony of participants in the relevant transactions plus some telling documentary materials—to which was added the cement of common sense and human experience. It is in this light that we must evaluate the contentions for reversal which we now take up. *See United States v. Ong,* 541 F.2d 331, 334 (2d Cir. 1976).

### The Mecom Bankruptcy Documents

John Mecom was, as we have said, the purchaser in one of the two revaluation sales the Government challenged as lacking in *bona fides.* Some months after that transaction he went into bankruptcy. As a Government witness, Mecom testified that he did not have the money to buy the Arctic interest to be sold to him but that King (or a King company) would supply the cash through a business deal, and would also buy back the property later on if Mecom wished. At the close of his cross-examination by King's counsel, the latter offered more than 200 pages of official documents relating to Mecom's bankruptcy. The stated purpose of the offer was to show that "there are representations made in these bankruptcy papers as to the Arctic contract, in which it is treated in the bankruptcy papers as a legitimate, binding contract, with no mention of any side agreements or anything having to do with any side agreements, up to a certain point in the bankruptcy, where the further papers show that there was a contest made for the first time where the contract was challenged, but not on the grounds that have been testified about in these proceedings." However, no specific parts of the bundle were pointed out to court or jury as inconsistent with Mecom's testimony—but it was and is clear that only a relatively small number of excerpts bore at all on those subjects. Nevertheless, the whole "sheaf of papers" was then summari-

ly received. Without any further substantial cross-examination of Mecom on the documents, counsel concluded cross-examination.

On redirect the prosecutor elicited from Mecom that he had prepared none of the 10 exhibits, that the papers had been prepared by his attorneys and accountants and he was generally ignorant of their contents, and that only three exhibits contained documents bearing his signature. Based on this redirect, the Government then moved to exclude the documents. Defense counsel responded with a voir dire bringing out that Mecom had apparently read the documents he signed and that where a contractual liability was disputable his lawyers would discuss the matter with him. Again, no specific parts of the exhibits were segregated out as inconsistent with Mecom's testimony; counsel did say, however, that he would be willing to excerpt the relevant portions and make a sub-exhibit. The court then granted the prosecution's motion to exclude, primarily on the ground that defendants had not yet indicated the claimed inconsistencies and had not sought to use the allegedly pertinent portions in cross-examination. A short while later, defense counsel again attempted to have the documents admitted; he explained that his intention had been to read to the jury the specific portions said to be inconsistent with Mecom's testimony but that he now realized that he should have brought out more from Mecom, and that at this point he merely wanted to go through certain of the documents with the witness, especially the signed ones, in order to bring out that the Arctic contract was listed in the bankruptcy proceedings without any question or reservation. In this connection counsel said: "I did not feel that I wanted to question the witness at great length about something that was obviously prepared by his attorneys but he swore to it. I was not going to make any big point about the fact that he prepared it or sweated over it." Emphasizing that the defense had twice foregone the opportunity to point out the alleged inconsistencies, to explain the relevance of this mass of official documents, and to connect

Mecom with those contradictions, and noting that "even as you put it now at most these [papers] are of modest potential relevance in this case," the court adhered to its ruling of exclusion.

On this appeal, appellants have blown up this exclusion as a major error affecting their opportunity to break down the Government's case. We do not so see it. The defense has now suggested all kinds of uses to which these bankruptcy documents could have been put at the trial (including extensive cross-examination of Mecom on various scores) but the record is clear that (a) the only purpose suggested for the admission of the papers was that they incorporated prior inconsistent statements of Mecom; (b) appellants' counsel never got down to singling out for the court or jury the particular portions of the documentary packet on which he relied for this purpose; (c) counsel twice refrained from cross-examining Mecom as to these inconsistencies when he had the chance; (d) even at the end of the effort to get the papers admitted, counsel obviously did not wish to cross-examine Mecom extensively or thoroughly on the basis of the papers but primarily wanted to read portions to the jury with only the lightest of explanation from Mecom; and (e) the record, as the defense left it, showed that Mecom's personal connection with the bankruptcy documents, to the extent there was any at all, was far from deep.

In these circumstances Judge Frankel was within his discretion to exclude the evidence. Counsel was very tardy in offering to point out and segregate the few relevant portions of the large file. *See Trade Development Bank v. Continental Ins. Co.,* 469 F.2d 35, 44 (2d Cir. 1972). Even then, the plan was to read selected excerpts to the jury without drawing from Mecom any substantial background for or explanation of the asserted contradictions. Judge Frankel was surely right in referring to the "modest potential relevance" of the alleged inconsistencies since there were several reasons why Mecom and his lawyer-and-accountant aides might not wish to mention the side-agreements with appellants in the bankruptcy papers. Fed.R. Evid. 403 authorizes a trial judge to exclude even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * *." In view of the official nature of the documents (the judge referred to "red seals and ribbons") with their possible untoward effect on the jury, the prolonged failure to pinpoint the small portions which were at all pertinent, counsel's refusal to explore the relationship between the submission of the papers to the bankruptcy court and Mecom's testimony in this case,[2] and the minor probative force of the evidence, the exercise of discretion under Rule 403 was available and could properly be used.

In any event, three of the excluded bankruptcy documents were later admitted, one of which defense counsel's summation put to the jury as demonstrating the very inconsistency he had stressed in trying to have the documents admitted during Mecom's testimony. If the subexhibit (containing the alleged inconsistencies) which counsel belatedly asked leave to submit had been accepted, the defense would not have been in a materially better position since, as we have stated, the course counsel wished to follow was to read and argue from the bankruptcy documents in just this fashion. We find no support for the strained argument that the court's prior handling of the problem of the bankruptcy papers so preju-

---

2. Under Rule 613 of the Federal Rules of Evidence, dealing with the admissibility of extrinsic evidence of a witness's prior inconsistent statement, the defense was not itself required to confront the witness with the statement or to give him an opportunity on cross-examination to explain—so long as the witness was afforded in some fashion an opportunity to explain or deny. However, that does not mean that in this instance the defense was not called upon to explore the matter further with Mecom in order to avoid exclusion under Rule 403 for "unfair prejudice, confusion of the issues, or misleading the jury." Rule 613 and Rule 403 fulfill separate functions. Although admissible under 613 the papers could be excluded under 403.

diced the jury that any defense argument in summation (based on the documents) could not be effective.

### Pre-indictment Delay

The indictment was brought in January 1975, towards the end of the limitations period but within it. Appellants claim, under *United States v. Marion,* 404 U.S. 307, 324–25, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), that they were deprived of due process by the delay between the occurrence of the alleged criminal acts and the beginning of the case. This issue was twice considered by the District Court, once before trial and, again, after trial. On the basis of extensive affidavits and documentation, Judge Frankel decided each time that there was insufficient merit in the point. In his post-trial ruling he concluded that "defendants show neither intentional delay for tactical advantage nor measurable prejudice * * *." Appellants suggest no adequate ground for overturning this considered determination.

A recent Supreme Court decision has clarified the principles underlying a finding that a pre-indictment delay violates the Due Process Clause. *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752, decided June 9, 1977. The Court first ruled that "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused" (431 U.S. at 790, 97 S.Ct. at 2049); then held that the prosecutor does not go against due process by refusing to seek indictments "until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt" (431 U.S. at 795, 97 S.Ct. at 2052); and concluded that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time" (431 U.S. at 796, 97 S.Ct. at 2052). The Court

indicated, however, as it had in *Marion,* that a "tactical" delay by the prosecution would violate the Constitution and implied that the same could well be true for a reckless disregard of the defendant's rights (431 U.S. at 795, fn. 17, 97 S.Ct. 2044).

■ Appellants' contention is that, as early as 1971–72, the Securities and Exchange Commission had enough facts to warrant a further investigation and a speedier indictment. It may well be that in those years the S.E.C. received information giving it probable cause to believe that both the Mecom and COG transactions were suspect, incorporating secret buy-back agreements.[3] But *Lovasco, supra,* explicitly teaches that prosecution need not, should not, follow where the Government merely has probable cause. It was not until July 1973 (after an attorney for FOF's successor went directly to the S.E.C. Director of Enforcement) that the S.E.C. initiated a full formal investigation into the Arctic deals (with one investigator). Meanwhile, the Denver office of the agency was heavily involved in investigating other of appellants' transactions of which it had earlier learned, but the S.E.C. cannot be faulted, in view of the limitations on its budget and staff, for concentrating on those other aspects, especially since the Arctic information available to it, though suggestive, was by no means conclusive. Similarly, the United States Attorney's Office in Denver was centering on these other phases of appellants' activity. At the very least, we find no basis whatever for thinking that the S.E.C.'s delay in starting to investigate the Arctic transactions, or the Department of Justice's judgment regarding priorities during this earlier period, was "tactical," intended to deprive the appellants of their rights of defense, or reckless of those rights. After the formal investigation began in the summer of 1973, an extensive inquiry was had, involving more than 80 interviewees and thousands of documents. The case was referred to the Department of

---

3. However, the S.E.C. did not then have adequate information as to appellants' representations in 1970–1971 to FOF's auditors.

Justice for possible prosecution in September 1974, and considering the complexity of the matter the indictment was promptly returned in January 1975.

The upshot is that, in our view, the period since July 1973 certainly fell within the type of "investigative delay" which *Lovasco* held not to deprive an accused of due process.[4] The prior time from 1971 to the middle of 1973, though not taken up with investigation focused on the Arctic, should likewise not be counted against the Government. During that period the federal agencies (S.E.C. and the Justice Department) plainly did not have nearly enough evidence to prove guilt beyond a reasonable doubt; they were not required to divert their energies from the other inquiries to delving into appellants' Arctic transactions; and they were neither attempting "to gain tactical advantage over the accused," *United States v. Marion, supra,* 404 U.S. at 324, 92 S.Ct. at 465, nor knowingly reckless of the risks to appellants in delaying prosecution. No plausible reason has been given us why the Government would have, or had, any purpose in 1971–1973 other than to concentrate on the separate investigations (into appellants and KRC) which at the time seemed to it much more likely to reveal provable wrongdoing; there is no substantial indication that placing the Arctic transactions "on hold" for that period was designed to injure appellants or harm their defense. When FOF's successor management brought the matter forward again in 1973, the S.E.C. stepped up its interest and the formal investigation began and proceeded in due course.

The other facet of appellant's presentation on this point is that they were substantially prejudiced by the lapse of time. As we have pointed out, *Lovasco* countenances some prejudice due to *bona fide* investigative delay. Judge Frankel said, after the trial, that he had "a definite conviction that defendants were not injured to any material extent by the lapse of time." Giving weight to this appraisal by the trial judge, we too find that any delay-prejudice appellants may have suffered did not deprive them of due process. They stress the death in June 1974 of Edward Cowett,[5] a high functionary of FOF, but are basically unable to say with any specificity or assurance what he would have said on the stand or how his testimony would have aided their case. We see no reason to believe that his testimony, if he were called, would have helped appellants. Cowett had, as far as the record reveals, nothing to do with any side-arrangements between appellants and Mecom or COG. On that, the heart of the case, he could have added little or nothing. Although there are materials suggesting the contrary, he may conceivably have known and approved the profits KRC generally made on its continuing sales of property to FOF, but if that were the corporate view of FOF appellants could and should have called Bernard Cornfeld, or other officers or directors of FOF, to show it.[6]

Another claim of prejudice is through the absence of two documents destroyed in ordinary course during the pre-indictment period. One was the original of the written buy-back letter agreement with Mecom (which had been retained by King's lawyer and later disposed of as no longer in effect), there being produced at the trial only unsigned copies which appellants challenged as inaccurate and never seen or authorized by King. Their main position is that if the original was also unsigned it would have tended to corroborate their contention that such a secret pact was never put into effect. This may possibly be so but we think that,

---

4. The Court held in *Lovasco* that a prosecutor could delay, even after he had developed the minimum evidence to prove guilt beyond a reasonable doubt, so long as he was continuing his investigation in good faith to firm up his case.

5. *Lovasco,* which held that no due process violation had been shown, involved the death (during the pre-indictment delay) of two persons said by the accused to be material witnesses for him.

6. Cowett's evidence was not wholly lost because his 1970 grand jury testimony—given in another connection but including a part of the general relationship between KRC and FOF—was read to the jury at appellants' request.

against the weight of oral and written evidence showing that King actually made such a side buy-back agreement, the loss of this original was too slight and too conjectural a prejudice to warrant dismissal of the indictment for delay for which the Government cannot properly be faulted under *Marion* and *Lovasco*. Also lost were the notes taken at the time by a newspaper reporter of a conversation with a high officer of COG in which the latter declared that he had a buy-back arrangement with KRC. This loss seems insignificant since the reporter's story was published the next day, and he was available at the trial for full cross-examination.

We have also considered the other instances of claimed prejudice, all of which were discussed extensively by both parties in the presentations made to the court below and here again, and again we find them too speculative, too peripheral, and too slight to call for dismissal. We mention only (a) the assertion of diminished recollection, a type of general prejudice which this court has already rejected, *United States v. Finkelstein*, 526 F.2d 517, 526 (2d Cir. 1975), *cert. denied, sub nom. Scardino v. United States*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); *United States v. Payden*, 536 F.2d 541, 544 (2d Cir. 1976) and (b) appellants' claimed lessened ability to assemble evidence from the KRC files, a general allegation unsupported by a showing of what such documents could be or why they were not subject to subpoena. The result is that, on the whole case, appellants have failed to show such substantial prejudice, considering that the Government was not at fault in the delay, as to require dismissal of the indictment.[7]

*Immunization Because of Bankruptcy Testimony*

Appellants both urge that the prosecution improperly used bankruptcy testimony given by them under a statutory grant of immunity—King during his personal bankruptcy proceedings in 1971 and 1973, Boucher, in 1971 and 1973, with respect to KRC's reorganization. This point was likewise gone into twice by the trial judge, before trial in written submissions (including affidavits) and after trial by further extended written presentations and an oral hearing. The gist of the Government's response was that only the S.E.C. attorney-investigator, not the United States Attorney's staff, had looked at this bankruptcy evidence and then only at some of it—and that there were independent sources for all the Government's material used to obtain the indictment or offered at the trial. Judge Frankel found post-trial, "a totally convincing demonstration by the prosecution that there was no use or derived use of the kind defendants posit. Clear, specific and credible accounts are given to display the untainted sources of the Government's witnesses and other evidence. Cross-examination [of the S.E.C. attorney] has not served to impair the persuasive showing made by the Government on this subject." The judge assumed that the prosecution has a heavy burden to disprove taint and held that burden met.

■■ We have no reason, after reviewing the record, to question the court's conclusion. The investigation below into possible taint was thorough and exhaustive, there is no claim that the Government failed to make full disclosure, the appellants had a full and fair opportunity to break down the Government's showing but failed to make a significant dent.[8] Because the

7. This court has upheld several convictions with comparably lengthy pre-indictment delays. See *United States v. Schwartz*, 535 F.2d 160 (1976); *United States v. Eucker*, 532 F.2d 249, 255 (1976), *cert. denied sub nom. Anderson v. United States*, 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); *United States v. Ferrara*, 458 F.2d 868, 875, *cert. denied*, 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 1972); *United States v. Iannelli*, 461 F.2d 483, 485, *cert. denied*, 409

U.S. 980, 93 S.Ct. 310, 34 L.Ed.2d 243 (1972); *United States v. Feinberg*, 383 F.2d 60 (1967), *cert. denied*, 380 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1968).

8. King says that the Government should have had transcribed certain of his bankruptcy testimony which was left untranscribed. Aside from his lateness in making this request, it was his obligation, which he did not fulfill, to show that prima facie the untranscribed testimony

prosecution already had independent sources for its full case, Boucher is wrong in claiming taint merely because the S.E.C. attorney, after the indictment in order to see what kind of witness this appellant would make, read Boucher's 1971 bankruptcy testimony (*see United States v. Bianco,* 534 F.2d 501, 514 n. 14 (2d Cir.), *cert. denied,* 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976)). The same is true of the Government's mere possession somewhere in its files of Boucher's 1973 bankruptcy testimony.[9]

### Refusals to Charge

■ Boucher says that the court erred in refusing to charge his defense that he relied on counsel in signing the representation letters to FOF's auditors. There are multiple defects in this claim. Boucher's position throughout the trial was that he knew nothing of any side-deals or buy-back arrangements with either Mecom or COG; it is very hard to see how in those circumstances a defense of reliance-on-counsel, which goes to unlawful intent not knowledge of the facts, could have any relevance. *See, e. g., United States v. Powell,* 513 F.2d 1249, 1251 (8th Cir.), *cert. denied,* 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77 (1975). Second, Boucher specifically testified on cross-examination that he did not recall relying on counsel before signing the representation letters; thus, there was no factual predicate for the requested instruction. Third, there was no showing that before he relied on counsel, if he did, he gave the lawyer all the relevant facts as to the Arctic transactions. *See Bisno v. United States,* 299 F.2d 711, 720 (9th Cir. 1961), *cert. denied,* 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818 (1962). Lastly, significant representations were made as to specific facts

(*e. g.* that there were no buy-back agreements) and as to those we cannot understand how a businessman who knows that such factual representations are untrue can screen himself by trying to rely on advice of counsel. *See Williamson v. United States,* 207 U.S. 425, 453, 28 S.Ct. 163, 52 L.Ed. 278 (1908).[10]

■ The only other attack respecting the charge is the refusal of the court to tell the jury that "if you do not fully understand the nature of the proof or the charges against either defendant, then you must acquit the defendant". In this case, with its components of financial and technical proof, much of it peripheral to the core issue of the Mecom and COG transactions, a sweeping charge of that kind was obviously inappropriate. The court gave unexceptionable instructions on reasonable doubt and burden of proof, and rightly centered its instruction on the paramount question of the *bona fides* of the Mecom and COG sales. The jury received the necessary guidance from the court to help it separate out the wheat.

### Admission of Evidence as to the Profitability of KRC's Business with FOF and of Loss to FOF from the Mecom and COG Transactions

The Government spent some time putting in evidence—through an S.E.C. accountant and a number of charts drawn from the books and records of KRC and King-related companies—of the profitability of KRC's business of selling undivided interests in natural resource properties to FOF.[11] Since appellants did not make any direct profit from the revaluation sales to Mecom and COG, the Government wanted to show the appellants' motive for arranging those

---

concerned matters related to the prosecution. *Kastigar v. United States,* 406 U.S. 441, 460, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**9.** Because we find no taint with respect to any of the evidence used by the prosecution, we need not consider the point that Boucher's 1973 testimony under Section 167 of the Bankruptcy Act, 11 U.S.C. § 567, did not grant him immunity.

**10.** It is noteworthy that, although no charge was given on the point, defense counsel suggested the defense in his summation.

**11.** Including the profits from the business of Colorado Corporation, a King-controlled (and mostly King-owned) company.

tainted transactions. That motive, as the prosecution presented it, was to enable KRC to demonstrate to FOF that the former's continuing project of selling properties to FOF was to the latter's financial advantage, thereby inducing FOF to prolong its program of purchasing from KRC (which was to KRC's great benefit).

It is in the trial judge's discretion to admit evidence suggesting the defendants' motive for the crime charged. *Moore v. United States,* 150 U.S. 57, 60–61, 14 S.Ct. 26, 37 L.Ed. 996 (1893); *United States v. Fernandez,* 497 F.2d 730, 735–36 (9th Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1423, 43 L.Ed.2d 670 (1975). The evidence objected to was carefully limited by the court to the question of motive for the allegedly sham sales to Mecom and COG, and the jury was instructed not to consider it as showing that KRC fraudulently overpriced its own sales to FOF. Appellants insist that nevertheless the evidence was highly prejudicial because it led the jury to consider them "bad men" who simply ought to be punished for milking FOF through high prices. We cannot accept this complaint. The information was highly relevant to the case; it explained why appellants would do what they were said to have done. The prosecutor's summation stressed KRC's financial interest but he tied it directly to the Mecom and COG sales as showing the motive why they were planned. Above all, the court kept the jury on the track in its instructions, in a specific direction as this evidence came in, as well as in the final charge. We do not think the jury was permitted to avoid confronting the summit issue of the Mecom and COG sales by sliding down the tempting slope that appellants were conviction-worthy simply because they were financial highbinders.

Appellants also say that the Government's presentation on this point was both excessive and inaccurate. Neither the time taken (half-a-day in a six-week trial) nor the amount of the evidence was immoderate, especially since appellants had refused (despite the judge's urging) to stipulate to sales and gross profits figures, and

their summary concession of the profitability to KRC of the FOF business came out subsequently in defendants' case (through the testimony of King). The claimed inaccuracy is that the Government's evidence, using gross profit figures, failed to take account of substantial indirect costs of KRC. The presentation followed the way in which KRC and Colorado Corporation kept their books, and appellants had full opportunity to challenge the correctness of the prosecution's calculations and to offer their own. *See United States v. Kyle,* 257 F.2d 559, 563–64 (2d Cir. 1958), *cert. denied,* 358 U.S. 937, 79 S.Ct. 327, 3 L.Ed.2d 308 (1959). The judge was not required to exclude the Government's evidence, based as it was on the books of KRC and KRC-related companies, because the defendants disputed that it accurately reflected the amount of KRC's and appellants' gain.

In the same vein, defendants challenge certain proof used by the prosecution to tell the jury that shareholders of FOF suffered a loss as a result of the fraudulent revaluation of the Arctic properties. There was evidence that in 1970 FOF faced a liquidity crisis because of the combination of the fact that a large percentage of its assets were the illiquid natural resource properties sold it by KRC and Colorado Corporation, together with the fact that large numbers of FOF shareholders redeemed their shares to take advantage of the increased valuation. To alleviate the situation FOF spun off the natural resource properties to a new closed company called Global. In summation the prosecutor pointed out that before the spin-off FOF's natural resources accounted for about $11 worth of each FOF share, but afterwards Global shares sold only for $2 to $3. This comparison, it is said, led the jury to think mistakenly that the $2–3 price was all the Arctic properties were actually worth at the time, far less than the revalued figure obtained through the *mala fide* Mecom and COG sales. The prosecutor's short reference to the Global spin-off was probably too cryptic but it came in a series of citations to other instances of damage to FOF and its share-

holders, damage not susceptible to challenge as misleading; we think that the spin-off remark, to the extent it may have been implicitly inaccurate, was not so injurious or so important as to be reversible error in itself.

### Exclusion of Evidence as to the 1976 Value of the Arctic Interests

The trial court precluded appellants from offering evidence on the current (1976) value of the KRC–FOF Arctic holdings. This is tagged as error because, defendants say, (a) proof of the high present value would have confirmed their belief in the properties in 1969–1970 and would have demonstrated their lack of intent to defraud, (b) proof of 1976 value goes toward showing 1969–1970 value,[12] and (c) present value demonstrates that appellants did not misrepresent in urging FOF to revalue its Arctic interests upward.

■ It may be that 1976 value would have some slender and marginal utility in firming up some of these propositions but Judge Frankel could properly exclude it because the complexity and delay which would be injected would far outweigh any contribution toward proving a proposition important to appellants' defense. *See* Fed. R.Evid. 403; *United States v. Corr,* 543 F.2d 1042, 1051 (2d Cir. 1976). If the case is seen in proper framework, it is beside the point that defendants had faith in the Arctic holdings in 1969–1970, that those assets had a good potential at that time, or that in the long run FOF and its shareholders benefited from their Arctic properties. The basic accusation was that appellants knowingly misrepresented in 1969–1970 that the sales to Mecom and COG were arms-length, including no buy-back side-deals, so as to induce FOF to revalue upward its Arctic assets. As we have stressed, the case went to the jurors under instructions expressly directing them to Mecom-COG as the focus of the fraud charged against appellants. That accusation poses an issue entirely separate from the actual value of the Arctic properties in 1969–1970, and theoretically the value of the properties in those years would not be directly pertinent. But even if one assumes that proof of 1969–1970 worth could help appellants to demonstrate that at that time they had no need, motive, or intent to concoct sham sales, disputable evidence of 1976 value is too remote and too far down the road to compel the trial judge to tolerate the additional complexities, delay, and possible confusion resulting from a side-battle over 1976 value (including the effect of the Arab oil embargo).

### The MacKenzie Statement in Boucher's Presence

In January 1971 a KRC directors' meeting, attended by Boucher, considered a suit which had been threatened by COG to rescind the latter's Arctic purchase. At that meeting, Neil MacKenzie, a KRC official and head of its Calgary office, said, in answer to a query whether the price paid by COG for its Arctic interest wasn't too high, that it was "ridiculous." Boucher admitted that he heard that remark and said nothing in response; his explanation (when the matter came up during his cross-examination) was that he "wasn't concentrating on this particular aspect at that time." MacKenzie's statement was admitted as an admission by silence on the part of Boucher,[13] and was used by the prosecutor to tell the jury that the price paid by COG was much too high and Boucher knew it. This is said to be prejudicial error.

■ The acceptance of MacKenzie's remark as an admission by silence on the part of Boucher was not incorrect. The general rule is to look at the circumstances to see whether it was more reasonably probable that a man would answer the charge made against him than that he would not. *United States v. Flecha,* 539 F.2d 874, 877 (2d Cir. 1976). Here, Judge Frankel could reasonably conclude that that test was met, Boucher having full opportunity to justify and explain his silence.

---

12. Appellants were not prevented from showing or arguing 1968–1970 value.

13. MacKenzie was living in South Africa at the time of the trial and could only be produced, it at all, at great expense.

MacKenzie was a knowledgeable official of KRC; the meeting was called to discuss what KRC should do (*e. g.* settle) about the anticipated COG lawsuit; MacKenzie's comments were serious ones about a matter in which Boucher had been and was directly involved, and they had a plain bearing on the course KRC should take on the COG suit; Boucher did comment on certain of MacKenzie's other statements but not on the observation that the price was "ridiculous." We cannot say that the court exceeded its discretion in allowing the jury to have this information.[14]

Once admitted, such an admission-by-silence was not hearsay and could be taken as an admission by Boucher of his belief in the statement and its truth. *See* Fed.R.Evid. 801(d)(2)(B). This was how it was used by the prosecutor in his argument. MacKenzie's view was not admitted or urged upon the jury as expert testimony; the Government, in suggesting that Boucher accepted MacKenzie's valuation, simply pointed out that in Boucher's own mind MacKenzie was a good judge of the level of the price COG paid.[15]

The conclusion we have reached, after carefully examining all the issues presented by each appellant,[16] is that none of them, singly or in combination, calls for reversal of either of the convictions.

The judgment as to each appellant is affirmed.

---

14. We read *United States v. Lam Lek Chong,* 544 F.2d 58, 65 n. 8 (2d Cir. 1976), as holding no more than that, in the very different circumstances of that case, the *Flecha* rule was not met.

15. King complains that MacKenzie's remark, although admitted only against Boucher, was improperly used against King as well in the Government's arguments to the jury. That summation, however, linked the remark to Boucher alone, and King's counsel had the opportunity to point out in his answering summation that King was not present or bound by MacKenzie's statement.

16. Although appellants, who are Denver-based, have made scattered reflections on the difficulties and unfairness of trial in New York, they have not raised in this court (though they did below) the refusal of the District Court to transfer the case to Denver or the due process unfairness of requiring them to stand trial in New York. If the case had been transferred to Denver it is almost certain that it would have had to be moved again because of intense publicity there.