**UNITED STATES of America, Appellee,**

v.

**Dominick MENNUTI,
Defendant-Appellant.**

**No. 678, Docket 81–1408.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 24, 1982.

Decided May 13, 1982.

Irwin Popkin, Hicksville, N. Y., for defendant-appellant.

Arlene R. Lindsay, Asst. U. S. Atty., E.D. N.Y., Brooklyn, N. Y. (Edward R. Korman,

U. S. Atty., E.D.N.Y., Jane Simkin Smith, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for the U. S.

Before FEINBERG, Chief Judge, and VAN GRAAFEILAND and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

The principal issue raised in this appeal is whether, for statute of limitations purposes, a conspiracy can continue even after the commission of the substantive underlying offense has been completed. The district court held that although the relevant five-year statute of limitations barred prosecution of appellant Dominick Mennuti for mail fraud, 18 U.S.C. § 1341 (1976), he could nevertheless be tried for conspiracy to commit mail fraud, 18 U.S.C. § 371 (1976), because overt acts in furtherance of the conspiracy occurred within five years of the filing of the indictment. We agree with the district court that this prosecution was not barred by the statute of limitations and, finding Mennuti's other claims without merit, we affirm his conviction.

## BACKGROUND

This case arises from the second attempt to prosecute Mennuti for his involvement in a scheme to destroy private residences in order to obtain insurance proceeds. The first indictment, filed on December 19, 1979, was brought under section 844(i) of Title XI of the Organized Crime Control Act of 1970, 18 U.S.C. § 844(i). The district court dismissed that indictment for lack of jurisdiction, however, because the destroyed property had never been used in commerce or in

an activity affecting commerce. *United States v. Mennuti*, 487 F.Supp. 539 (E.D.N.Y.1980). This Court affirmed. 639 F.2d 107 (2d Cir. 1981).

On February 23, 1981, the government filed a second indictment, charging Mennuti with participating in a conspiracy to commit mail fraud, 18 U.S.C. §§ 371, 1341 (1976).[1] The underlying offense of mail fraud occurred in December 1975, when CNA Insurance Company (CNA) issued an insurance proceeds check for $10,732 for a residence destroyed in Ridge, New York. The indictment alleged five overt acts in furtherance of the conspiracy, two of which occurred within five years of the filing of the indictment: the endorsement and deposit of the check on March 15, 1976 and Mennuti's own "payoff" in the scheme, the bargain purchase of the property following destruction, in July 1976.[2]

Because we had no occasion in our earlier opinion to provide a detailed recitation of the facts underlying this case, we do so here. The government presented evidence that in February 1973, Robert Roy and a partner purchased the Ridge, New York residence for $13,500, paying $2,000 in cash and assuming a mortgage for the balance.[3] The residence was used for rental purposes until January 1975, when the tenant moved without advance notice. The house was vandalized twice while vacant, suffering extensive damage which was not covered by any insurance policy.

During this period, Mennuti operated Mark Real Estate in Shirley, New York. Following the vandalism, Roy enlisted Mennuti's aid to rent or sell the property, but

---

1. The indictment named Edward Cruser, Robert Roy, Victor Natale and Frank Tricoli as Mennuti's co-conspirators in the scheme. These co-conspirators made plea agreements and were therefore never tried.

2. The three alleged overt acts occurring more than five years before the indictment's filing are:
   1. On or about and between September 1, 1975 and September 19, 1975, the defendants DOMINICK MENNUTI and ROBERT ROY met at the premises of Mark Real Estate, Shirley, New York.

   2. On or about and between September 1, 1975 and September 19, 1975, the defendants ROBERT ROY and FRANK TRICOLI met.
   3. On or about September 19, 1975, the defendants VICTOR NATALE and EDWARD CRUSER drove to 26 Sally Lane, Ridge New York.
   App. at vii.

3. Title to the property was actually taken in the name of PTR Holding Company, which was wholly owned and operated by Roy and his partner, Frank Tricoli.

their efforts were unsuccessful. Finally, in September 1975, Mennuti offered to have the house burned to recover the insurance proceeds. Roy testified that Mennuti referred him to a man who had "done this thing for me before." Tr. 68. The cost to Roy for the destruction was set at $3,000—$1,500 then and another $1,500 when the insurance proceeds were received. Mennuti's payoff for arranging the plan was to be the exclusive right to sell the property after destruction.

After several days, Roy agreed to the plan. Mennuti decided, however, that instead of selling the land as Roy's agent, he preferred to purchase the property himself and attempt to resell it at a profit. Roy testified that he needed $6,500 to break even and that Mennuti agreed to purchase the land following the destruction of the house for that amount. Roy stated that the paperwork and arrangement of details of the sale were deferred until after the burning. A short time later, Roy paid the initial $1,500. The house was destroyed on September 19. Approximately one month later, Roy paid the remaining $1,500. After the destruction, Roy mailed a "Sworn Statement in Proof of Loss" to CNA for $12,500, the full amount of the insurance coverage. CNA issued [4] a check for $10,732 payable to Roy and to the mortgagees on or about December 22, 1975. Roy cashed the check on March 15, 1976 and used the proceeds to pay off the mortgage.

In January 1976, Roy met with Mennuti to discuss the sale of the property. Mennuti reported that he had located a buyer who could purchase the property in July 1976. The parties then signed a contract granting Mennuti the exclusive right to purchase the property for $6,500, to be paid at the July closing.[5] Roy complained that he needed the $6,500 sooner, but Mennuti stated that he could not pay the money until he had sold the property.

The closing occurred as scheduled. The record is unclear as to the details of the transaction. However, it appears that Mennuti first assigned his contract to a real estate broker for $8,100. The broker then sold the contract to the buyer for $8,700. The government presented evidence of Mennuti's profit from the transaction.

The defense attempted to establish that Mennuti had bought the land intending to build a house on it, but later sold the property as a result of unfavorable market conditions. Mennuti chose not to testify after the district court ruled that the government would be permitted to cross-examine him with respect to the destruction of another house, which had been a subject of the first indictment. Following a jury verdict of guilty, the district court sentenced Mennuti to a term of two and one-half years imprisonment and fined him $5,000.

## DISCUSSION

In addition to claiming that this prosecution was barred by the statute of limitations, Mennuti argues that the district court erred in ruling that the government could cross-examine him concerning the 1975 destruction of another house and in permitting the government to introduce evidence of his profit from the conspiracy. Mennuti also contends that his sentence is "excessive."

4. The government presented no direct evidence that the check was mailed. At the close of the government's case, Mennuti moved to dismiss on the ground that a necessary jurisdictional element to the crime of conspiracy to commit mail fraud was actual use of the mails, and that the government's evidence had failed to prove that element. The district court denied the motion, holding that the government was "not obliged to prove that the crime of mail fraud was committed, only that there was a conspiracy to do something." Tr. 259. In its charge, the court instructed the jury "that the Govern-ment [must] prove beyond a reasonable doubt that it was foreseeable that the conspirators' scheme would involve the use of the mails." Tr. 403. We agree with the district court that actual use of the mails is not an essential element of conspiracy to commit mail fraud.

5. The option was actually given to Brooktown Homes, a corporation operated by Mennuti and his son. The defense introduced evidence that Mennuti's son had signed the contract on behalf of Brooktown Homes.

### I. *Statute of Limitations*

Mennuti argues that the five-year statute of limitations in this case began to run on December 22, 1975 when the CNA insurance check was issued. Because the indictment was filed on February 23, 1981, he urges us to reverse his conviction. In *Grunewald v. United States,* 353 U.S. 391, 397, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957), the Supreme Court stated:

> the crucial question in determining whether the statute of limitations has run is *the scope of the conspiratorial agreement,* for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy.

(emphasis added). The government was therefore obliged to show that the conspiracy, as contemplated by the agreement, still existed and that "one overt act in furtherance of the conspiracy occurred" no more than five years prior to the filing of the indictment. *United States v. Brasco,* 516 F.2d 816, 818 (2d Cir.), *cert. denied,* 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975).

Mennuti asserts that the object of the conspiracy was to acquire control over the CNA check and that when the check was acquired, concededly outside of the limitations period, the conspiracy ended. We think it abundantly clear, however, that the scope of the conspiracy was not limited to receipt of the insurance check. The conspiratorial agreement also included a payoff to each conspirator, which in Mennuti's case was the exclusive right to purchase the property at a bargain price after the house was destroyed. Tr. 71. In fact, Mennuti's sole reason for becoming involved in the scheme was to purchase the property at a low cost and then resell it at a profit. While Mennuti and Roy executed a contract in January 1976 giving Mennuti the right to purchase the property, it was understood at that time that the purchase would occur in July 1976. Only in July, which was within

five years of the indictment's filing, did Mennuti receive his payoff.

Mennuti argues that receipt of economic benefits should not be included within the scope of the conspiracy for purposes of the statute of limitations. He suggests that if, instead of reselling the property, he had retained it, hoping to benefit from a favorable market, he could be subject to liability indefinitely. Mennuti's payoff, however, was not the resale of the property, but its purchase at a bargain price.[6]

We have held in other contexts that a conspiracy continues until the conspirators receive their payoffs. For example, in *United States v. Knuckles,* 581 F.2d 305, 313 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978), we ruled that hearsay statements by a co-conspirator were admissible into evidence when made "before the spoils [were] divided among the miscreants." *Accord, United States v. Floyd,* 555 F.2d 45, 48 n.10 (2d Cir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1977). We find Mennuti's attempt to distinguish these cases on the ground that they dealt with evidentiary as opposed to statute of limitations issues unpersuasive.

Our conclusion that a conspiracy continues until the conspirators receive their anticipated economic benefits finds support in decisions of other circuits. In *United States v. Walker,* 653 F.2d 1343 (9th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982), the defendant contended that his prosecution for conspiracy to defraud the United States by bid-rigging a timber sale was barred by the statute of limitations because he had been awarded the timber contract more than five years prior to the filing of the indictment. The Ninth Circuit rejected this contention, holding that "even if the central objective of the conspiracy in this case was to get the award, if the conspirators *also* planned to divide the profits, the conspiracy lasted until that additional objective was accom-

---

**6.** We observe that the fifth overt act alleged in the indictment was the transfer of the property to Mennuti's corporation "[o]n or about July 9,

1976." The subsequent resale at a $1,600 profit was not asserted as an overt act.

plished." *Id.* at 1350. Similarly, even if the main objective of the conspiracy in this case was to defraud CNA, the conspiracy continued until its other objectives, including Mennuti's own payoff, were achieved.[7] *See United States v. Hickey*, 360 F.2d 127, 141 (7th Cir.), *cert. denied*, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966) ("Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, ... the conspiracy may be found to continue."); *Koury v. United States*, 217 F.2d 387, 388 (6th Cir. 1954) (per curiam) ("A conspiracy is not ended by the illegal transportation of a stolen car when the fruits of the transportation are yet to be obtained and divided by the conspirators.").

## II. *Cross-Examination*

Mennuti next claims that the district court denied him due process by ruling that the government would be free to cross-examine him about the destruction of another house which had been the subject of his first indictment. Mennuti elected not to take the stand as a result. He now asserts that this ruling "effectively ... denied [him] an opportunity to take the witness stand in his own defense." Brief for Appellant at 17. The district court ruled that the cross-examination was not barred by Fed.R. Evid. 403.[8] Tr. 268–70.

■ Mennuti argues that apart from Rule 403, the cross-examination should have been barred by Rule 608.[9] Whatever merit this contention may have, the record is clear that Mennuti based his request at trial solely on Rule 403 and the district court considered only Rule 403 in its ruling. As we stated in *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir.), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977),

> The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, ... and where the party has had ample opportunity to make the point in the trial court in a timely manner, ... waiver will bar raising the issue on appeal.

(citations omitted). *See United States v. Fuentes*, 563 F.2d 527 (2d Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); Fed.R.Evid. 103. Mennuti is therefore barred from raising a Rule 608 argument on appeal.

■ We have no doubt that the district court's ruling was proper under Rule 403. Mennuti had informed the court that if he took the stand he would deny any involve-

---

**7.** Mennuti relies principally on *Bridges v. United States*, 346 U.S. 209, 73 S.Ct. 1055, 97 L.Ed. 1557 (1953), to support his position that a conspiracy cannot endure beyond the achievement of the underlying substantive offense for purposes of the statute of limitations. We believe that *Bridges* is inapplicable for the reasons set forth by the Ninth Circuit in *Walker*, 653 F.2d at 1346. We see no reason to repeat the Ninth Circuit's thorough and lengthy analysis here.

**8.** Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**9.** Rule 608 provides:

(a) *Opinion and reputation evidence of character.* The credibility of a witness may be attacked or supported by evidence in the form of an opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

(b) *Specific instances of conduct.* Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility.

ment in the destruction of Roy's house or that he had referred Roy to the men who actually set the fire. The government indicated that it could establish that Mennuti had in fact been involved in two prior destructions using the same arsonists. It was within the district court's broad discretion to conclude under Rule 403 that the probativeness of the government's evidence was not substantially outweighed by the prejudicial effect. *See United States v. Benedetto*, 571 F.2d 1246, 1251 (2d Cir. 1978).

### III. *Mennuti's Profit*

Mennuti contends that through the testimony of two government witnesses, the jury was able to deduce the amount of his profit from participating in the conspiracy. He views the profit as irrelevant to the object of the conspiracy and argues that "[i]t serves no other purpose but to confuse the jury and prejudice the defendant." Brief for Appellant at 19. The government responds that Mennuti's profit was relevant to his motive for arranging the fire.

"It is in the trial judge's discretion to admit evidence suggesting the defendants' motive for the crime charged." *United States v. King*, 560 F.2d 122, 133 (2d Cir.), *cert. denied*, 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977) (citing *Moore v. United States*, 150 U.S. 57, 60–61, 14 S.Ct. 26, 27–28, 37 L.Ed. 996 (1893)). We believe that Mennuti's profit from reselling the property after the fire was relevant to the government's case. As we stated in *King*, "it explained why [Mennuti] would do what [he was] said to have done." 560 F.2d at 133. There was no abuse of discretion here.

### IV. *Sentencing*

Finally, Mennuti labels his sentence "grossly excessive" in comparison with the suspended sentences received by his co-conspirators, each of whom entered into a plea agreement with the government. Mennuti's sentence was well within the statutory range, and he does not contend that the district court relied on material misinformation or misunderstanding, or applied constitutionally impermissible factors in deter-

mining his sentence. *United States v. Mejias*, 552 F.2d 435, 447 (2d Cir.), *cert. denied*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977). Quite to the contrary, the court conducted extensive presentence hearings and was informed of a variety of relevant factors, including Mennuti's involvement in a number of similar house destructions. Under these circumstances, his sentence is beyond our review.

The judgment of the district court is affirmed.