UNITED STATES of America, Appellee,

v.

**Erasmus FLECHA, Appellant.**

**No. 1059, Docket 76–1099.**

United States Court of Appeals,
Second Circuit.

Argued May 19, 1976.

Decided June 23, 1976.

Jonathan J. Silbermann, New York City (William J. Gallagher, Legal Aid Society, New York City, of counsel), for appellant.

Douglas J. Kramer, Asst. U.S. Atty., Brooklyn, N.Y. (David G. Trager, U.S. Atty., E.D.N.Y., and Paul B. Bergman, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before LUMBARD, FRIENDLY and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge:

Appellant was tried before Judge Weinstein and a jury in the District Court for the Eastern District of New York in the spring of 1973 on a three count indictment, along with Jose Pineda-Marin, Hugo Suarez, Ernesto Santo Gonzalez and Moises Banguera. The indictment charged the importation of 287 pounds of marijuana, possession of this with intent to distribute it, and conspiracy to commit these two substantive offenses, in violation of 21 U.S.C. §§ 952(a), 841(a)(1), and 846 and 963. The jury returned guilty verdicts against all defendants on all counts, except with respect to Banguera as to whom the court had dismissed the substantive counts at the close of the Government's case. The convictions of Flecha's co-defendants were affirmed by this court on March 7, 1974, without opinion. For reasons unnecessary to detail, Flecha's appeal was delayed in reaching us. Although he raises only a single point with respect to the allegedly erroneous admission of a declaration of his co-defendant Gonzalez, a summary of the facts is necessary for understanding it.

During the morning of March 25, 1973, the Francisco Miguel, a Colombian freighter, arrived in New York and tied up at the State Pier in Brooklyn. As a result of information received from the Customs Service at Galveston, Texas, customs agents set up a surveillance of the vessel that evening. One agent saw Suarez and Pineda-Marin, both crew members, in conversation on the deck. Later the agents observed appellant Flecha, who was not a crew member and was not authorized to be on the ship, in frequent conversations with Suarez and Pineda-Marin between midnight

and 1:50 a.m., a time when Suarez was the deck watchman. At times they entered a hatchway at the rear of the ship; at 1:50 a.m., four men, including Pineda-Marin, Flecha, and Gonzalez, who also was not a crew member, came out of the hatchway, dragging four large bales to a point amidship on the starboard deck. This was on the seaward side of the vessel and, unlike the similar area on the port side, was not lighted. Five minutes later another agent saw six men enter the pier area through a hole in the fence and scurry to a grain elevator near the bow of the ship. Still another five minutes later two men ran from the grain elevator onto a pier that ran past the bow. One of them slid into the water and swam across the bow; the other, Banguera, remained crouched at the pier's piling.

At this point the agent in charge gave the order to close in. Suarez and Pineda-Marin were found on the port side of the vessel; Flecha and Gonzalez were running on the starboard side from the middle of the ship toward the stern. Agent Cabrera identified himself and ordered them to stop. They did not, Cabrera fell on the slippery deck, and his gun went off. Gonzalez then stopped but Flecha kept running and went down the rear hatchway of the ship. He was apprehended at the entrance to the crew's quarters.

After all the defendants had been arrested, the agents found four bales containing 287 pounds of marijuana in the place where they had been dragged by the four who were aboard ship. The captain of the vessel testified that when he came aboard about 1:45 a.m. Suarez failed to inform him of the presence of unauthorized persons on the ship, although it was part of his duty to do so.

Not satisfied with this compelling case, the prosecutor elicited from Agent Cabrera that, as all five defendants were standing in line, he heard Gonzalez say in Spanish, apparently to Flecha:

Why so much excitement? If we are caught, we are caught.

The three lawyers who represented defendants Banguera, Suarez and Pineda-Marin immediately sought an instruction that this was "not binding" on their clients; the court said "Granted." Counsel for Flecha then joined in the application. Judge Weinstein asked Agent Cabrera how far away Flecha was from Gonzalez; Cabrera answered that Flecha was right next to Gonzalez, only six to twelve inches away. The judge then denied Flecha's application.

■■■ Although the judge did not articulate his reasons for granting the applications of Banguera, Suarez and Pineda-Marin but denying Flecha's, it is not difficult to reconstruct what his thought process must have been. To state the matter in terms of the later-enacted Federal Rules of Evidence, which in respects here relevant do not differ from the common law, the judge properly concluded that Gonzalez' declaration was not admissible as "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy," Rule 801(d)(2)(E), since the conspiracy was over and the statement was not in furtherance of it. He must also have concluded that the declaration was not admissible under Rule 803(2), the hearsay exception for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." This was probably right since Gonzalez' plea by its own terms indicated a lack of excitement. His allowing Gonzalez' statement to stand against Flecha although not against the three other objectors must thus have rested on a belief that as to Flecha the case fell within Rule 801(d)(2)(B), allowing receipt, as an admission of the party against whom it is offered, of "a statement of which he has manifested his adoption or belief in its truth."

■ The brief *voir dire* demonstrates that the judge fell into the error, against which Dean Wigmore so clearly warned, 4 Wigmore, Evidence § 1071, at 102 (Chadbourn rev. 1972), of jumping from the correct proposition that hearing the statement of a third person is a necessary condition for

adoption by silence, see *e.g., United States v. Moore*, 522 F.2d 1068, 1074–76 (9 Cir. 1975), cert. denied, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976), to the incorrect conclusion that it is a sufficient one. After quoting the maxim "silence gives consent," Wigmore explains "that the inference of assent may safely be made only when no other explanation is equally consistent with silence; and there is always another possible explanation—namely, ignorance or dissent—*unless the circumstances are such that a dissent would in ordinary experience have been expressed if the communication had not been correct.*" (Emphasis supplied.) However, "the force of the brief maxim has always been such that in practice . . . a sort of working rule grew up that *whatever was said in a party's presence* was receivable against him as an admission, because presumably assented to. This working rule became so firmly entrenched in practice that frequent judicial deliverances became necessary in order to dislodge it; for in this simple and comprehensive form it ignored the inherent qualifications of the principle." (Emphasis in original.) Among the judicial deliverances quoted, it suffices to cite Chief Justice Shaw's statements in *Commonwealth v. Kenney*, 53 Mass. 235, 237 (1847), that before receiving an admission by silence the court must determine, *inter alia* "whether he [the party] is in such a situation that he is at liberty to make any reply" and "whether the statement is made under such circumstances, and by such persons, as naturally to call for a reply, if he did not intend to admit it"; and Lord Justice Bowen's more succinct statement in *Wiedemann v. Walpole*, 2 Q.B. 534, 539 (1891):

> Silence is not evidence of an admission, unless there are circumstances which render it more reasonably probable that a man would answer the charge made against him than that he would not.

We find nothing in the Advisory Committee's Note to Rule 801(d)(2)(B) to indicate any intention to depart from these sound principles. To the contrary the Committee noted that difficulties had been raised in criminal cases and that "the inference is a fairly weak one, to begin with."

▊ We find it hard to think of a case where response would have been less expectable than this one. Flecha was under arrest, and although the Government emphasizes that he was not being questioned by the agents, and had not been given *Miranda* warnings, it is clear that many arrested persons know, without benefit of warnings, that silence is usually golden. Beyond that, what was Flecha to say? If the Spanish verb used by Gonzalez has the same vagueness as "caught," it would have been somewhat risible for Flecha, surrounded by customs agents, to have denied that he had been. Of course, Flecha could have said "Speak for yourself" or something like it, but it was far more natural to say nothing.[1]

---

1. In *United States v. Lo Biondo*, 135 F.2d 130 (2 Cir. 1943), this court held that where two defendants are under arrest, and one responds to official questioning with an answer tending to implicate the other, the second need not deny the statement and his failure to deny does not make the statement admissible against him, save perhaps in extraordinary circumstances. Although the parties failed to cite this case to us, the Government did discuss *United States v. Yates*, 524 F.2d 1282, 1285 (D.C. Cir. 1975). The facts there were similar to those in *Lo Biondo* except that it is not clear whether the co-defendant's statement alleged to have been adopted by silence was in response to police interrogation. The court held that admission of the statement was precluded by *Miranda v. Arizona*, 384 U.S. 436, 468 & n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is the Government's position that *Yates* (and presumably *Lo Biondo*) are inapplicable to a statement "intended to be a private communication."

The split of opinion regarding whether an admission "adopted" by silence after arrest, especially in the presence of police interrogators, is entirely barred or allowable in proper circumstances, is generally canvassed in 4 Wigmore, *supra*, § 1072(4) at 118 & n. 11; cases regarding the impact of *Miranda* on the problem are collected at 3 Wigmore, *supra*, § 821 at 309 & n. 3. It is now clear that when *Miranda* warnings have been given, the prosecution cannot constitutionally adduce evidence as to silence at that time. *Doyle v. Ohio*, —— U.S. ——, 96 S.Ct. 2240, 49 L.Ed.2d 91, (1976); see also *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). In view of our holding, based on common law rules of evidence, that Flecha's silence could not be con-

■ There is no force in the Government's argument that Gonzalez' statement "was not admitted for its truth, but rather for what it showed about Gonzalez' and Flecha's state of mind," and thus was not hearsay. Of course, it was not hearsay as to Gonzalez but in order to be relevant against Flecha, it would have to be at least a description by Gonzalez of Flecha's state of mind ("You know you are guilty") and that would be hearsay unless Flecha adopted it by silence. There is equally little force in the Government's claim of inadequacy in the objection of counsel. The judge saw the point perfectly well and thought he had met it when it was established that Gonzalez' statement was made in Flecha's presence. In this he was mistaken, as has been shown.

■ We have thought it desirable to write on this in order to prevent future reliance on the "working rule" so rightly condemned by Wigmore and other eminent jurists, rather than because of the effect of the ruling in this case. For we agree with the Government that the error was harmless. There is no need to restate the damning facts already recounted. It was plain as anything could be that Flecha and Gonzalez were the link between the two crewmen, Suarez and Pineda-Marin, and the men on shore (including the frogman) in what was to be the importation of the four bales of marijuana for distribution. No other credible explanation existed for these antics on a Colombian ship and a Brooklyn pier in the early hours of a rainy morning. Most significantly, although Gonzalez' declaration was not allowed to stand as against the two crew members or Banguera, who had not even been on the ship, the jury convicted them. It seems hard to think of the judge's erroneous admission against Flecha of Gonzalez' statement as having confrontation-clause dimensions; "merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that con-

sidered as having adopted Gonzalez' statement, we have no occasion to consider whether *Miranda* has any application to a case where

frontation rights have been denied," *California v. Green,* 399 U.S. 149, 156, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970). But if there was constitutional error, see also note 1, *supra,* we have no hesitation in saying it was harmless beyond a reasonable doubt.

Affirmed.

there was no official interrogation and no warnings had been given.