UNITED STATES of America, Appellee,

v.

Hugh O'Brien ROBINSON, Appellant.

No. 80 CR 120.

United States District Court,
E. D. New York.

Sept. 17, 1981.

Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., for appellee; Vivian Shevitz, Charles E. Rose, Asst. U. S. Attys., James Hiler, Law Student Asst., of counsel.

The Legal Aid Society, Federal Defender Services Unit by David Seth Michaels, New York City, for appellant.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Hugh O'Brien Robinson appeals from his misdemeanor conviction, following a bench trial before United States Magistrate John L. Caden of the Eastern District of New York,[1] for knowingly offering, exposing and keeping with intent to furnish counterfeit United States currency in violation of 18 U.S.C. § 491(b).[2] This appeal presents the interesting question whether, consistent with a defendant's Fifth Amendment privilege against self-incrimination and rights to due process, the prosecution may comment upon evidence of pre-arrest silence where no defense case is presented. Mindful that the facts and issues presented here require us to enter largely unexplored territory, see *United States v. Caro*, 637 F.2d 869, 876 (2d Cir. 1981), and *United States v. Flecha*, 539 F.2d 874, 877 n. 1 (2d Cir. 1976), under the circumstances of this case the Court answers this question in the affirmative and upholds appellant's conviction.

The evidence at trial showed that on November 16, 1979, appellant was fined $250 in the Brooklyn, New York, Criminal Court for an unspecified infraction. Appellant wanted to pay the fine immediately, and court officer Paul Moriarity was assigned to accompany him down to the cashier's office, deliver the court papers there and see that appellant actually paid the fine.

As appellant stood at the cashier's cage, Moriarity, standing approximately two feet behind him, observed the cashier review the papers and ask appellant for $250.[3] Appellant took his wallet from his pocket and opened it. Moriarity noticed that the wallet contained three separate "packets" of currency, each folded over with the ends facing downward into the wallet. Appellant selected $250 in bills and gave them to the cashier, who placed them under a counterfeit currency detector light. Moriarity's testimony, none of which was objected to, continued as follows:

> "A. ... I seen [sic] that all the bills were not of the same quality as the rest of the bills. She gave him back the four bills and said now give me real money.
>
> Q: What did Mr. Robinson do at that point?
>
> A: At that point he went back into his wallet and produced another $80.

1. Appellant's trial on a misdemeanor information was held before the Magistrate on consent of the parties pursuant to 18 U.S.C. § 3401. Appeal to this Court is provided by 18 U.S.C. § 3402.

2. Section 491(b) of Title 18, U.S.C., provides, in pertinent part:
   "Whoever manufactures, sells, offers, or advertises for sale, or exposes or keeps with intent to furnish or sell any token, slug, disk, device, paper, or other thing similar in size and shape to any of the lawful coins or other currency of the United States, ... with knowledge or reason to believe that such tokens, slugs, disks, devices, papers, or other things are intended to be used unlawfully or fraudulently to procure anything of value, ... shall be fined not more than $1,000 or imprisoned not more than one year, or both."
   Appellant was sentenced to six months imprisonment. Execution of sentence was stayed pending this appeal.

3. The cashier, Mabel Moore, testified at trial that her area is generally busy and that she was unable to recollect the particular transaction with appellant on November 16, 1979.

Q: Were you able to see where Mr. Robinson took that from his wallet? Was it any one particular packet?

A: I really couldn't say.

Q: Did Mr. Robinson say anything?

A: No.

Q: You were unable to see the expression on his face at that time?

A: No.

Q: Continue with your description of what happened after that. Mr. Robinson went back into his wallet, paid the money. Was there any further problem with the production of counterfeit notes?

A: No. There were no further problems. It was genuine cash."

T. 21.[4] The cashier, apparently satisfied with the transaction, gave appellant a receipt and told Moriarity he could leave.

Moriarity, however, motioned to appellant to wait a moment, while he learned from the cashier her belief that the money was counterfeit. He then asked appellant to accompany him to his captain's office, which appellant did voluntarily. In the office, appellant handed over his wallet without objection to Moriarity and two superior officers. Moriarity then took the packets out, unfolded them and counted the bills, trying to keep them in the same sequence. He counted $511, of which $220, in the form of eleven $20 notes, was later determined to be counterfeit. Moriarity stated that at that time, he had difficulty determining exactly which bills were counterfeit as "some of the bills looked like photostats of regular currency," T. 29, and he could not be sure about others.

Moriarity phoned the United States Treasury Department and read the numbers of some of the bills to Secret Service Special Agent John Rodriguez, who confirmed that they were counterfeit. At that point, Moriarity told appellant that he was under arrest and advised him of his constitutional rights. Rodriguez arrived and examined the notes, which were then in one stack, having been counted and the packets unfolded by Moriarity. Rodriguez observed that the first few bills in the stack were genuine while each of the next several was counterfeit and thereafter the last few in the pile were again genuine.

It was stipulated that Government's Exhibits 1–11 were eleven $20 bills taken from appellant's wallet and that these notes were counterfeit. No defense case was presented.

In summation before the Magistrate, the government argued that its circumstantial evidence proved beyond a reasonable doubt that appellant knowingly possessed the eleven counterfeit notes. Specifically, the prosecution contended:

"Moving on to Mr. Robinson's actions during this time, we find he hands the notes in. One fourth of the notes are handed back and he's told 'Now, give me some real money'; what does he say? Absolutely nothing, doesn't challenge her conclusion, doesn't express surprise, doesn't even get mad at the fact that he's been burned for $80.

"Your honor, we submit it's inconsistent with his [lack of] knowledge. We believe that if someone were to find out for the first time if they are paying a Court fine that there are $80 worth of [counterfeit notes] they would at least be somewhat surprised.

\*　　\*　　\*　　\*　　\*　　\*

"He failed to contest [the cashier's] conclusion and then he went back into his wallet and took out the additional money to pay the deficient $80. Mr. Robinson pulled out $80 and had absolutely no problem distinguishing which notes were good and which were bad. . . . After he was caught there was no problem distinguishing.

\*　　\*　　\*　　\*　　\*　　\*

"When Mr. Robinson is caught he attempts to smooth it over, the entire inci-

---

**4.** References are to the page numbers of the transcript of the trial before the Magistrate on January 30, 1981.

dent, make as little beef about it as possible." T. 38–39, 40–41.

The defense contended that it was unlikely that one would attempt to pass counterfeit currency in a criminal court building. As to whether an inference could be drawn from appellant's reaction to the cashier, defense counsel argued:

"I think the prosecution forgets there was a Court Officer two feet behind him and, again, there's no obligation or any duty for Mr. Robinson to say anything at any point in time. The best course of action for Mr. Robinson was to say nothing and try to resolve the matter later. In fact, no burden can be borne against him for not reacting." T. 44.

Defense counsel stated that his objection was not to specific evidence adduced on the prosecutor's case in chief. Rather,

"it came in the argument of the summation [of the government]. There was no reference one way or the other to object to at the time. It's an argument based by the prosecution.

"There is no evidence I could have objected to.... The defendant was actually under no obligation at that point in time in all circumstances to, in any way, say anything or show any reaction. I think at that point in the right course of action is to do nothing." T. 48–49.

The Magistrate, upon examination of the eleven bills, commented "that Andrew Jackson never looked so bad." T. 45–46. He found further that the serial numbers on Exhs. 1, 10 and 11 were identical, that Exhs. 3, 4, 5 and 6 had identical serial numbers, and that the remaining four counterfeit notes also shared the same serial number. In addition, the Magistrate found that appellant had not been detained at the time of the transaction at the cashier's cage.

As to the government's argument based upon appellant's conduct following the cashier's statement, the Magistrate concluded this was relevant and considered it "significant when Mr. Robinson was confronted with the fact he did have counterfeit bills, he said nothing, made no objection and [this occurred] despite the fact there were several other counterfeit bills still in his possession at that time, for all practical purposes duplicates and any person would have known [it] looking at those bills, they were exactly like the ones that were passed." T. 47.

Finally, the Magistrate stated that consideration of this argument did not violate appellant's rights under the Fifth Amendment.

■ Appellant argues in this Court that the government presented legally insufficient proof to establish that he knew the bills were counterfeit. Citing *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), and *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), he asserts that his Fifth Amendment "right to remain silent" was violated by the Magistrate's consideration of arguments from his reaction to the cashier's statement.

*Hale* and *Doyle*, however, are distinguishable because the defendants in those cases had been taken into custody and given warnings required under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Supreme Court held in those cases that the prosecution may not make use of a defendant's silence after receiving such warnings. As Judge Friendly has recently explained:

"Two slightly different considerations have been adduced to support this prohibition. One is that silence following *Miranda* warnings is 'insolubly ambiguous' since it may be nothing more than an exercise of the rights described by the warnings. [*Doyle v. Ohio, supra,* 426 U.S.] at 617 [96 S.Ct. at 2244] .... The other is that the warnings convey an implicit assurance to a suspect that his silence will not be used against him. *Id.* at 618 [96 S.Ct. at 2245] ...." *United States v. Caro*, 637 F.2d 869, 875 (2d Cir. 1981).

In the instant appeal both these rationales are inapplicable because appellant was not in custody at the time in question, a finding of the Magistrate we cannot term erroneous, and therefore was not entitled to

*Miranda* warnings. See *United States v. Vega,* 589 F.2d 1147, 1151 n.1 (2d Cir. 1978).[5] Last term, in *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Supreme Court held that where no *Miranda* warnings are given and it is clear that none are required under the circumstances, neither of the considerations addressed in *Hale* and *Doyle* prohibited the otherwise proper impeachment of a defendant's exculpatory testimony by the use of his silence prior to arrest. Specifically, the Court in *Jenkins* held that the defendant's testimony that he had killed another in self-defense could be impeached by evidence that he did not report the killing to the police until two weeks after the incident.

The opinion of the majority in *Jenkins* relied on the defendant's voluntary decision to testify, which activated counterbalancing considerations of the integrity of the truth-finding process, requiring cross-examination and impeachment, even if it could be argued that such impeachment burdened the defendant's privilege against self-incrimination. 447 U.S. at 236–38, 100 S.Ct. at 2128–29. When the prosecutor seeks to use evidence of silence on his case in chief, however, the absence of these considerations requires a closer examination of the assert-ed "right to remain silent." See *United States v. Vega, supra,* 589 F.2d at 1151 n.3. Since the prosecutor in *Jenkins* sought to introduce pre-arrest silence only for the purpose of impeachment, a majority of the Court did not believe it necessary to resolve the central issue presented on the instant appeal:

> "Our decision today does not consider whether or under what circumstances prearrest silence may be protected by the Fifth Amendment. We simply do not reach that issue because the rule of [*United States v. Raffel,* 271 U.S. 494 (1926)] clearly permits impeachment even if the prearrest silence were held to be an invocation of the Fifth Amendment right to remain silent." 447 U.S. at 236 n.2, 100 S.Ct. at 2128 n.2.

Mr. Justice Stevens in concurrence, however, went further than the majority. Joined by Mr. Justice Stewart, he concentrated on the precise language of the claimed constitutional protection [6] and rejected Jenkins'

> "Fifth Amendment claim because the privilege against compulsory self-incrimination is simply irrelevant to a citizen's decision to remain silent when he is under no official obligation to speak." 447 U.S.

---

**5.** While appellant concedes that he was not in custody on the counterfeit currency charge, he nonetheless asserts that under the circumstances he was in the equivalent to custody. (App.Br. at 11–12.) However,

> "a non-custodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).

Here, since no law enforcement officer questioned appellant and there is no suggestion that he was under suspicion for any offense, the mere fact that he was in a Criminal Court Building accompanied by a court officer did not entitle him to *Miranda* warnings. Accordingly, appellant cannot rely on those recent cases extending *Hale* and *Doyle* and prohibiting the use of a defendant's silence after he is entitled to but before he has actually received *Miranda* warnings. See *United States v. Nunez-Rios,* 622 F.2d 1093, 1101 (2d Cir. 1980); *People v. Conyers,* 49 N.Y.2d 174, 424 N.Y.S.2d 402, 406–07, 400 N.E.2d 342, 346–47 (1980). We note, moreover, that the Supreme Court, 449 U.S. 809, 101 S.Ct. 56, 66 L.Ed.2d 12 (1980), has recently vacated *People v. Conyers, supra,* and remanded it to the State courts, in light of its decision in *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), which is discussed in the text above.

**6.** The Fifth Amendment provides in pertinent part:

> "No person ... shall be compelled in any criminal case to be a witness against himself ...." U.S.Const. Amdt. V.

at 241, 100 S.Ct. at 2130 (footnote omitted).

Justice Stevens stated that the considerations requiring deference to a defendant's right to remain silent at trial

> "have no application in a prearrest context. The fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence before he has any contact with the police. We need not hold that every citizen has a duty to report every infraction of law that he witnesses in order to justify the drawing of a reasonable inference from silence in a situation in which the ordinary citizen would normally speak out. When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment. For in determining whether the privilege is applicable, the question is whether petitioner was in a position to have his testimony compelled and then asserted his privilege, not simply whether he was silent. A different view ignores the clear words of the Fifth Amendment.... Consequently, I would simply hold that the admissibility of petitioner's failure to come forward with the excuse of self-defense shortly after the stabbing raised a routine evidentiary question that turns on the probative significance of that evidence and presented no issue under the Federal Constitution." *Id.* at 243–44, 100 S.Ct. at 2132 (footnotes omitted).

In footnote 7, Justice Stevens added:

> "Under my approach, assuming relevance, the evidence could have been used not only for impeachment but also in rebuttal even had petitioner not taken the stand." *Id.* at 244 n.7, 100 S.Ct. at 2132 n.7.

Upon careful examination of the important interests involved, Justice Stevens' rationale is persuasive and fully applicable here. This appeal does not present the situation where a citizen is being expressly directed to provide information that incriminates him. *Cf. Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). Appellant was not asked by the cashier—who was not a law enforcement officer—if he knew the bills were counterfeit, and it could hardly be said that he was a suspect in any official investigation with regard to the charge he was tried upon.[7] We simply cannot discern in this case the element of compulsion that would activate Fifth Amendment considerations. In our view, what is contested here is no more than the government's suggested inference from appellant's silence in a situation which, arguably, would have caused the average innocent citizen to react in some way other than did appellant.

Agreeing with Justice Stevens that we are presented with an evidentiary and not a constitutional question, the Court is of opinion that the consideration of appellant's reaction was proper as an adoptive admission under Rule 801(d)(2)(B) of the Federal Rules of Evidence. In this regard,

> "[t]he general rule is to look at the circumstances to see whether it was more reasonably probable that a man would answer the charge made against him than that he would not. *United States v. Flecha*, 539 F.2d 874, 877 (2d Cir. 1976)." *United States v. King*, 560 F.2d 122, 134 (2d Cir.), *cert. denied*, 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977).

There is no question that appellant saw the cashier return the four notes to him and heard her request their replacement by "real money." Indeed, appellant demonstrated he understood the cashier by his simple response of returning to his wallet and choosing four genuine bills. Appellant did not contest the cashier's implication nor even request an explanation. He did not express any of the surprise that might be expected of an innocent citizen who learns that he has been the victim or dupe of

---

7. This is not a case that presents the "particular legal thicket" the court managed to avoid in *United States v. Brown*, 548 F.2d 1194, 1209–10 (5th Cir. 1977), where the defendant, after being read a statement similar to that required under *Miranda*, declined to respond to the precustodial requests for potentially incriminating information made by Internal Revenue Service Special Agents.

criminality. The Court is of opinion that Magistrate Caden could reasonably conclude that in this situation the average man would not have acted as appellant did. Accordingly, the suggested inference from appellant's reaction was probative and its consideration not improper.

■ Since the Court is of opinion that the Magistrate did not err in considering the argument based on appellant's reaction to the cashier's statement, the only remaining question is whether there was sufficient evidence to establish the element of knowledge. In this regard, we must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Davila*, 440 F.Supp. 670, 671–72 (D.P.R.1977). See Rule 8(d), Federal Rules of Procedure for the Trial of Minor Offenses Before U. S. Magistrates. We must draw all reasonable inferences in favor of the government, *United States v. Marchisio*, 344 F.2d 653, 662 (2d Cir. 1965), and reverse only if the Magistrate's conclusions were clearly erroneous. *United States v. Hughes*, 542 F.2d 246, 248 (5th Cir. 1976).

■ In reviewing a conviction for possessing and proffering counterfeit currency, the element of knowledge must generally be proved by circumstantial evidence and the reasonable inferences that may be drawn therefrom. See *United States v. Sheiner*, 410 F.2d 337, 340 (2d Cir.), *cert. denied*, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969); *United States v. Carlson*, 359 F.2d 592, 597 (3d Cir.), *cert. denied sub nom. Bonomo v. United States*, 385 U.S. 879, 87 S.Ct. 161, 17 L.Ed.2d 106 (1966).

The Magistrate properly scrutinized appellant's conduct at the time he paid the $250 fine. *United States v. Cervantes*, 466 F.2d 736, 739–40 (7th Cir.), *cert. denied*, 409 U.S. 886, 93 S.Ct. 108, 34 L.Ed.2d 143 (1972); *United States v. Browning*, 390 F.2d 511, 513 (4th Cir. 1968). The evidence showed that four counterfeit notes were secreted among several genuine ones. Appellant's money was separated into packets which apparently distinguished genuine from counterfeit currency. When asked to present "real money" appellant, without hesitation or difficulty selected four genuine $20 bills out of a wallet that contained notes with a total face value of over $500.

Appellant had in his wallet a substantial amount of counterfeit currency which represented a relatively large proportion of all the money he carried, making it less probable that he had unknowingly received a stray counterfeit note in a prior innocent transaction. The fact that the appearance of the bills suggested that they were counterfeit—which Magistrate Caden found "any person would have known looking at those bills"—should have made appellant, who kept them separated into "packets," suspicious of their genuineness. *United States v. Sheiner, supra*, 410 F.2d at 340. Finally, we cannot disagree with the Magistrate's conclusion that it was significant that when confronted by the cashier appellant said nothing and continued payment of the fine without comment.

The Court is persuaded that when viewed as a whole the government's evidence, although not overwhelming, was sufficient to establish appellant's guilt beyond a reasonable doubt.

Accordingly, the conviction is

AFFIRMED.