**UNITED STATES of America, Appellant,**

**v.**

**Christopher D. REYES, Defendant–Appellee.**

**Docket No. 01–1258.**

United States Court of Appeals, Second Circuit.

Argued: Dec. 12, 2001.

Decided: Aug. 26, 2002.

Daniel S. Ruzumna, Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney, Anirudh Bansal, Christine H. Chung, Assistant United States Attorneys, Southern District of New York, New York, NY, of counsel), for Appellant.

Michele Hauser, New York, NY, for Defendant–Appellee.

Before: CARDAMONE, POOLER, and B.D. PARKER, Jr., Circuit Judges.

CARDAMONE, Circuit Judge.

The government appeals from a district court's judgment of acquittal after a jury had found defendant Christopher Reyes guilty of joining a conspiracy to transport stolen automobile airbags in interstate commerce. Among the issues we deal with is the doctrine of conscious avoidance in the context of a conspiracy. Conscious

avoidance occurs when a person deliberately closes his eyes to avoid having knowledge of what would otherwise be obvious to him. But such deliberate ignorance, as this case illustrates, does not establish that person's innocence.

## BACKGROUND

Between September 1994 and May 1998, Maurizio Percan sold over a million dollars worth of stolen automobile airbags through his business, All–in–One Auto Parts (All–in–One), located in the Bronx, New York. In September 1999 Percan was convicted of the substantive crimes of transporting stolen goods in interstate commerce in violation of 18 U.S.C. §§ 2314 and 2, money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1957, and 2, and was also convicted of a conspiracy to commit these offenses. We affirmed his conviction. See United States v. Kalust, 249 F.3d 106, 109–10 (2d Cir.), cert. denied sub nom. Percan v. United States, —— U.S. ——, 122 S.Ct. 213, 151 L.Ed.2d 152 (2001). Eileen Kalust, who worked at All–in–One, and several individuals who supplied stolen airbags to All–in–One were convicted on related charges.

Defendant Christopher Reyes was a business associate and personal friend of Percan's, close enough to have attended Percan's wedding. Reyes was the manager of Alpine Motor Cars, a used car and salvage lot located next door to All–in–One. He was arrested in March 2000 and charged with a single count of conspiring to transport stolen property in interstate commerce. See 18 U.S.C. §§ 371, 2314. During his trial, at the close of the government's case-in-chief, defendant moved pursuant to Fed.R.Crim.P. 29(a) for a judgment of acquittal. Rule 29 authorizes a trial court to enter a judgment of acquittal if the evidence is insufficient to support a conviction. U.S. District Court Judge Robert P. Patterson, who presided at the trial, reserved ruling on Reyes' motion. See Fed.R.Crim.P. 29(b). While a district court may reserve decision on a motion for judgment of acquittal, its later ruling on the motion must be based only on the evidence before the court at the time of the reservation. Id.

At the conclusion of the five-day trial the jury returned a guilty verdict. At that time Judge Patterson granted Reyes' motion for a judgment of acquittal, a decision that prompted this appeal. The decision made by our respected district court colleague granting the motion for acquittal is one with which we disagree. We think the jury reasonably could have found Reyes guilty based on the evidence presented in the government's case-in-chief. Hence, we reverse.

### A.  Government's Case–in–Chief

The relevant evidence in the case is that presented by the prosecution prior to the trial court's reservation on defendant's Rule 29(b) motion. We set out that evidence. Eileen Kalust was the government's first witness. According to her, Reyes dropped in at Percan's All–in–One during the existence of the airbag conspiracy several mornings each week for breakfast and to chat before heading to work next door at Alpine Motor Cars, a business that opened one-half hour later. Kalust testified that from 1994 through 1996 the "vast majority" of All–in–One's business was in stolen airbags, and the company continued to sell stolen airbags into 1997. She further stated that on one occasion during the course of her four-year employment, Reyes brought a pair of airbags into her office at All–in–One and left them with her, after asking for Percan who was not there at the time. These airbags were in a plain, white plastic bag, not accompanied by a receipt. According to Kalust, people

that Percan referred to as "thieves" delivered airbags in the same fashion, that is, in a plain wrapper, unaccompanied by a receipt, often with cut connector cables protruding. Kalust believed airbags delivered in this manner were stolen.

In addition, she explained that at Percan's direction she wrote 14 checks to Reyes, all of which were introduced by the government into evidence. These checks, drawn on All–in–One's bank account, were for various amounts and totaled over $17,000.

The prosecution's next witness was New York City Police Detective Thomas Burke who testified as an expert. According to him, the secondhand airbag market consists nearly entirely of stolen airbags. He stated that secondhand airbags that have not been stolen come from limited sources—like insurance companies that acquire vehicles that have been "totaled" in an accident—and that it is rare to find a totaled car with its airbags intact. Once deployed, Burke explained, an airbag is not reusable.

He estimated that in 1996 and 1997 secondhand airbags, whether stolen or not, sold for $700 to $800 a pair. In contrast, a pair of new airbags cost $2000. As a result, there was a strong secondhand market for stolen airbags. Because the lawful supply of secondhand airbags is limited, the detective said, demand for airbags was met largely by airbags stolen from autos on the street and sold by thieves to secondhand auto parts dealers and body shops.

The final witness for the prosecution was FBI Agent Blythe Helmer, who testified, among other matters, with respect to Reyes' post-arrest statements. She told the trial court and jury that "Mr. Reyes did not directly answer the questions that were presented to him" and hesitated before giving his answers. When Agent Helmer showed Reyes "photographs of thieves who provided stolen airbags to [All–in–One]," he admitted knowing "[s]ome of them" but refused to provide her with any information about them. She recalled Reyes had "stated that he did not want to give up any of his friends." The defense did not object to this testimony by Agent Helmer.

According to her, Reyes admitted he had referred customers to All–in–One, but insisted the only compensation he received for this service was an occasional free sandwich or return business referrals from Percan. However, after Agent Helmer confronted defendant with the checks from All–in–One, he admitted having acted as a middleman or broker for Percan and having been paid $50 for each airbag in those cases where he had assisted in the sale. Reyes further admitted to Agent Helmer that he had provided translation services to assist Percan in the sale of airbags.

The agent went on to recite that Reyes explained to her that he had received checks from All–in–One in exchange for his services as "an intermediary or a middleman or a broker" with respect to the sale of airbags. Although Helmer stated she could not remember the exact words used, it was her understanding that Reyes assisted "both with people who were trying to provide air bags to Maurizio Percan and people who were purchasing air bags for [sic] Maurizio Percan." Again, no objection was taken by defendant to this portion of the government's case-in-chief. The transcript also reveals the trial court reminded Agent Helmer several times during direct examination to answer only the question asked her.

Agent Helmer stated that when she asked defendant whether he knew about the theft of airbags and sales of stolen airbags, he responded with an analogy.

Reyes said he behaved as someone with a friend who uses drugs: he turned the other way to avoid seeing the illegal activity. At a later point in her direct examination, the agent elaborated on Reyes' drug analogy.

Q: [D]id you ask Mr. Reyes any questions about his state of knowledge about whether the air bags were stolen?

. . .

A: We asked Mr. Reyes at several different junctures about the stolen nature of the merchandise, and at least on two occasions that I remember specifically, there could have been a third occasion, his response was an analogy to drug use and when you see a friend using drugs you see what's happening, but you turn the other way. That's not a quote. It was that, in substance.

And on redirect, she repeated the drug analogy and testified that Reyes made the analogy in response to having been asked if he knew the transactions he was brokering involved stolen airbags.

The prosecution's final proof consisted of two recordings of telephone calls to Reyes from a government informant pretending to be in need of secondhand airbags. These recordings were made after the period of the charged conspiracy, so they were admitted only to show Reyes's knowledge and intent. See Fed.R.Evid. 404(b) (providing that "other act" evidence may be admitted to show knowledge). In the first call, recorded on August 27, 1998, the informant asked defendant for a set of airbags for a 1997 Honda Accord. Reyes told the informant he would check around for the airbags and asked him to call back in an hour. Defendant estimated the set of airbags would cost between $700 and $900. He also stated, "I'm not sure, because I told you that I wasn't dealing too much with that stuff anymore." The same confidential informant called defendant

again on November 2, 1998 and asked for airbags for a Honda Civic and a Honda Accord. Reyes told the informant that "things are dead around here." He explained that the mayor was a "hard hitter" and so "the people who were doing it, are scared now." He further commented that no one wants to spend the holidays in a "bullpen."

Since this was all the evidence produced in the government's case-in-chief, it is the only evidence pertinent to this appeal. Prior to ruling on defendant's motion for judgment of acquittal, the district court held a hearing on February 22, 2001 to review the statements and reports of witnesses that the FBI provided pursuant to 18 U.S.C. § 3500 and to determine the reliability of that material. In deciding the Rule 29 motion, however, none of that testimony is relevant.

## DISCUSSION

### I  Preliminary Matters

█ Two legal points should be dealt with at the outset. First, our review of this appeal does not violate Reyes' constitutional protection against double jeopardy because in no event will he be subject to a second trial. See, e.g., United States v. Autuori, 212 F.3d 105, 114 (2d Cir.2000); United States v. De Garces, 518 F.2d 1156, 1159 (2d Cir.1975).

█ Second, a district court can enter a judgment of acquittal on the grounds of insufficient evidence only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We review the district court's ruling on the motion de novo,

applying the same standards as that court did. *United States v. Guadagna,* 183 F.3d 122, 129 (2d Cir.1999). Thus, we will consider only the evidence presented in the prosecution's case-in-chief.

## II   Conspiracy to Transport Stolen Airbags

Reyes was charged with conspiracy to transport stolen airbags in interstate commerce. The general federal conspiracy statute, 18 U.S.C. § 371, prohibits "two or more persons [from] conspir[ing] either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, [provided] one or more of such persons do any act to effect the object of the conspiracy." In this case, the underlying federal offense is the transportation of stolen goods through interstate commerce with the knowledge that such goods were stolen. *See* 18 U.S.C. § 2314.

■ We begin our analysis with the three elements of conspiracy under federal law. They are: (1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) commission of an "overt act" by one or more members of the conspiracy in furtherance of the conspiracy. *See United States v. Samaria,* 239 F.3d 228, 234 (2d Cir.2001); *United States v. Salameh,* 152 F.3d 88, 145–46 (2d Cir.1998) (per curiam). We will refer to this conspiracy involving stolen airbags as the "Percan/All–in–One conspiracy."

The district court found, and Reyes concedes, that Percan and Kalust made the requisite agreement, had the requisite intent, and committed an overt act. The only disputed issue is whether the government produced sufficient evidence to show that Reyes knowingly engaged in the Per-can/All–in–One conspiracy with the intent to violate 18 U.S.C. § 2314. In other words, we must decide whether the evidence of Reyes' knowledge was sufficient to find him guilty as a co-conspirator in an existing conspiracy.

■ In reviewing the proof on this issue, we consider the evidence as a whole. Once the conspiracy has been shown to exist—as has been conceded—evidence sufficient to link another defendant to it need not be overwhelming, and may be proved entirely by circumstantial evidence. *United States v. Desimone,* 119 F.3d 217, 223 (2d Cir.1997).

■ Further, in analyzing the sufficiency of the evidence with respect to Reyes' intent to participate in an existing conspiracy, there are two separate inquiries. *See United States v. Ferrarini,* 219 F.3d 145, 154–55 (2d Cir.2000), *cert. denied,* 523 U.S. 1037, 121 S.Ct. 1997, 1998, 149 L.Ed.2d 1001 (2001). The government must first prove the defendant intended to engage in the charged scheme. *Id.* Here, the prosecution needed to prove beyond a reasonable doubt that Reyes knew the Percan/All–in–One conspiracy existed and that he knowingly and willingly joined in it. *See id.; United States v. Gaviria,* 740 F.2d 174, 183 (2d Cir.1984).

The prosecution also must show that Reyes had some knowledge of the unlawful aims of the conspiracy, *Ferrarini,* 219 F.3d at 155, that is, in this case, that Reyes knew Percan was dealing in stolen airbags. *See* 18 U.S.C. § 2314 (forbidding transportation in interstate commerce of stolen goods, provided the defendant knew goods were stolen). Application of the theory of conscious avoidance is of course appropriate where intent, *i.e.,* guilty knowledge, is an essential element of the crime. *See United States v. Mankani,* 738 F.2d 538, 547 n. 1 (2d Cir.1984). For this guilty

knowledge part of the intent element, once defendant's participation in the conspiracy has been established, the prosecution can satisfy its burden of proof by showing that Reyes consciously avoided actual knowledge of the purposes and objectives of the conspiracy. *United States v. Eltayib,* 88 F.3d 157, 170 (2d Cir.1996).

### III Doctrine of Conscious Avoidance

Because we observed at the outset of this opinion that the doctrine of conscious avoidance plays a key role in our disposition of this appeal, we explain what we mean by conscious avoidance, and how this Circuit has come to apply this doctrine in conspiracy cases. The doctrine of conscious avoidance, also known as deliberate ignorance or willful blindness, has its roots in the 19th-century English legal system. *See* Ira P. Robbins, *The Ostrich Instruction: Deliberate Ignorance as a Criminal Mens Rea,* 81 J.Crim. L. & Criminology 191, 196–197 (1990). According to one scholarly treatise

> A court can properly find wilful blindness only where it can almost be said that the defendant actually knew. He suspected the fact; he realised its probability; but he refrained from obtaining the final confirmation because he wanted in the event to be able to deny knowledge. This, and this alone, is wilful blindness.

Glanville Williams, *Criminal Law: The General Part* § 57, at 159 (2d ed.1961). While not without detractors, the doctrine has found fertile ground in this country where it has taken root. We believe it is a practical necessity given the ease with which a defendant could otherwise escape justice by deliberately refusing to confirm the existence of one or more facts that he believes to be true. *Robbins, supra,* at 192–93, 196–202.

In *Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the Supreme Court articulated the modern doctrine of conscious avoidance by reference to the Model Penal Code. In *Leary,* the Court reasoned that, in addition to actual knowledge, a defendant can also be said to know a fact if he "is aware of a high probability of its existence, unless he actually believes that it does not exist." *Id.* at 46 n. 93, 89 S.Ct. 1532. Several years later, the Ninth Circuit had occasion to explain more thoroughly the influence of the Model Penal Code on the doctrine of conscious avoidance, finding that

> [t]he substantive justification for the rule is that deliberate ignorance and positive knowledge are equally culpable. The textual justification is that in common understanding one "knows" facts of which he is less than absolutely certain. To act "knowingly," therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question. When such awareness is present, "positive" knowledge is not required.
>
> This is the analysis adopted in the Model Penal Code.

*United States v. Jewell,* 532 F.2d 697, 700 (9th Cir.1976) (en banc).

In conformity with this view our precedents establish that the doctrine may be invoked to prove defendant had *knowledge* of the unlawful conspiracy. But we do not permit the doctrine to be used to prove intent to participate in a conspiracy. The reason for this distinction is that common sense teaches it is logically impossible to intend and agree to join a conspiracy if a defendant does not know of its existence. *Mankani,* 738 F.2d at 547 n. 1. Yet once defendant's participation in a conspiracy has been proved, conscious avoidance may

properly be used to prove his knowledge of its unlawful objectives.

■ Courts in this Circuit commonly give the jury a conscious avoidance instruction "when a defendant claims to lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance." *United States v. Gabriel,* 125 F.3d 89, 98 (2d Cir.1997); *see also United States v. Rodriguez,* 983 F.2d 455, 457 (2d Cir.1993). When a defendant has been charged with conspiracy, however, the jury may use the conscious avoidance doctrine to establish the defendant's knowledge of the aims of the conspiracy but, as just noted, may *not* use it to establish the defendant's intent to participate in the conspiracy. *See Ferrarini,* 219 F.3d at 155; *Eltayib,* 88 F.3d at 170; *see also Mankani,* 738 F.2d at 547 (explaining the illogic of using the conscious avoidance doctrine to prove intentional participation in a conspiracy). *But see, e.g., United States v. Lara–Velasquez,* 919 F.2d 946, 951–53 (5th Cir.1990) (not analyzing the knowledge element of conspiracy in two parts, thus allowing conscious avoidance to satisfy all aspects of knowledge). With this background on the doctrine, we turn to the merits.

## IV    Sufficiency of the Government's Evidence

### A. *Intentional Participation*

■ The evidence already described was sufficient to show Reyes intentionally joined the Percan/All–in–One conspiracy. According to Agent Helmer's testimony, defendant admitted referring to Percan both buyers and sellers of secondhand airbags and providing Spanish translation services to facilitate sales. The numerous checks made payable to Reyes corroborated these admissions. Although All–in–One conducted some legitimate business, Detective Burke and witness Kalust testified

that stolen airbags comprised nearly all of the general market for secondhand airbags and nearly all of All–in–One's business.

Again, Kalust described one occasion when Reyes dropped off a set of undocumented airbags at All–in–One in a plain plastic bag, which was the manner that thieves would deliver stolen airbags. Given that Reyes earned approximately $17,000 from a business that consisted mostly of stolen airbag sales and that he delivered a set of airbags to All–in–One in the manner of an airbag thief, a reasonable jury could infer that he intentionally participated in stolen airbag transactions that were part of Percan's illegitimate activities. *See United States v. Rosa,* 17 F.3d 1531, 1543 (2d Cir.1994) (stating that circumstantial evidence may be sufficient to support a finding of conspiratorial intent).

### B. *Knowledge that Airbags Were Stolen*

■ The next question is whether the evidence was sufficient to establish that Reyes knew the airbags he was helping to sell were stolen. We think the evidence in the government's case-in-chief would have permitted a reasonable jury to conclude that Reyes either knew the airbags were stolen or consciously avoided confirming that fact.

Defendant worked as the manager of a used car and salvage lot. According to Burke, stolen airbags were common in the secondhand airbag market, and thieves usually sold the stolen airbags to dealers of used auto parts. Considering these facts together, a reasonable inference is that Reyes, who referred airbag customers to All–in–One, either knew the illegal nature of All–in–One's business or consciously avoided knowledge of it. It is reasonable to believe that someone in Reyes' position, making referrals in a product market dominated by stolen goods, would

know whether the dealer to whom he steered customers sold stolen airbags.

After his arrest, Reyes waived his *Miranda* rights and talked with Agent Helmer and two other officers about the charges against him. In Agent Helmer's trial testimony she stated that Reyes admitted referring airbag customers to All-in-One. At first he denied receiving any compensation for these referrals, except for return referral business or an occasional sandwich. The officers then presented defendant with the $17,000 in checks he had received from All-in-One. Confronted with such hard evidence, he recanted his earlier statement and admitted Percan paid him $50 for each transaction in which he (Reyes) took part. If he truly did not know that the airbags were stolen, Reyes doubtless would have admitted at the outset that he received money from All-in-One in exchange for his help. Thus, it is reasonable to infer guilty knowledge from Reyes' false exculpatory statement. *See United States v. Middlemiss,* 217 F.3d 112, 119 (2d Cir.2000) (explaining jury entitled to infer guilt from false exculpatory statement).

Defendant correctly points out that false exculpatory statements, by themselves, do not provide sufficient evidence of guilty knowledge. *See United States v. Nusraty,* 867 F.2d 759, 765 (2d Cir.1989). But, in this case there was more evidence that Reyes knew the airbags were stolen, and the reviewing court must view the evidence as a whole. *See, e.g., United States v. Diaz,* 176 F.3d 52, 89 (2d Cir.), *cert. denied,* 528 U.S. 875, 120 S.Ct. 181, 314, 315, 145 L.Ed.2d 153 (1999). The agent testified that she asked Reyes more than once whether he knew the airbags he helped to sell were stolen. She said he responded each time by giving an analogy to looking away to avoid seeing a friend using drugs. A reasonable interpretation of this analogy is that Reyes thought the airbags were stolen, but deliberately avoided confirming that fact. In other words, he engaged in conscious avoidance.

In addition, Kalust's testimony about Reyes' delivery of a set of undocumented airbags, without an innocent explanation, supports an inference that those airbags were stolen. As noted, airbag thieves and only airbag thieves would deliver their wares in much the same way, and this manner of delivery signaled to Kalust that the airbags were stolen. Possession of stolen goods may be interpreted by the factfinder as evidence that the possessor *knows* that the goods are stolen. *Cf. Barnes v. United States,* 412 U.S. 837, 845–46, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *United States v. Coleman,* 196 F.3d 83, 89 (2d Cir.1999). Although a single instance of possession of seemingly stolen goods would not always provide *sufficient* evidence of guilty knowledge if considered in isolation, it does provide *some* evidence of guilty knowledge. When combined with other evidence of guilty knowledge, a reasonable jury could find defendant guilty beyond a reasonable doubt. The district court appears to have discounted this evidence of guilty knowledge entirely because there were possible, though obviously not offered in the government's case, innocent explanations for Reyes' conduct. In doing so, the court failed to view the evidence in the light most favorable to the government.

Moreover, there are the recordings of two telephone conversations between Reyes and a confidential informant. As stated earlier, these calls took place after the period of the charged conspiracy, so they cannot be taken as evidence of participation in the charged conspiracy. But, as "other act" evidence under Fed.R.Evid. 404(b), they are probative of Reyes' knowledge. We agree with the district court

that Reyes' knowledge was at issue, and therefore reject defendant's contention that the recordings should not have been introduced into evidence.

One could reasonably infer from the recordings that Reyes knew about the stolen airbag market at the time of those telephone calls. More specifically, it could also be inferred that he knew he was brokering transactions involving *stolen* airbags because of the references in the second call to things being "dead" because "the mayor [is] a hard hitter" and nobody wanting to spend the holidays in a "bullpen." This knowledge supports the inference that Reyes knew Percan was dealing in stolen airbags during the period of the charged conspiracy, when he admitted to brokering airbag transactions for Percan.

Considering all of this evidence in the light most favorable to the government, we think the government provided sufficient evidence to sustain the jury's guilty verdict.

## C. *District Court's Rationale*

The district court's decision granting the motion for judgment of acquittal was based upon its concern regarding the reliability of Agent Helmer. The court observed that she often failed to state either the precise question she asked or the precise answer defendant gave her. The trial court further characterized part of Agent Helmer's testimony—the portion relating to Reyes' admission to acting as a broker for Percan—as a "volunteered opinion" that "must be disregarded." Without evidence of Reyes' post-arrest admissions, the court explained, the government failed to present sufficient evidence of Reyes' intent.

We agree that the agent's testimony was crucial to the sufficiency of the government's case. But we think it error for the district court to disregard that testimony.

None of the evidence described above—including the testimony about which the district court had doubts—was objected to and none of it was stricken from the record. As a consequence, such evidence should have been considered in deciding the Rule 29 motion. *Cf. United States v. Rosenberg*, 195 F.2d 583, 596 (2d Cir.1952) (holding that jury may consider evidence, even if it is hearsay, if the evidence was not objected to at trial and not stricken from the record).

Further, had the government known the district court would ultimately discredit Agent Helmer's testimony, it likely would have clarified her testimony while she was still on the witness stand. By waiting until the prosecution rested before ruling that Agent Helmer's testimony was too unreliable to be trusted, the district court deprived the prosecution of the chance to introduce evidence to which the court did not have any objection. There was nothing inherently unreliable or inconsistent about Agent Helmer's testimony: it was not conjectural and did not contain prohibited hearsay. In short, it was not suspect in any way sufficient to warrant the district court's conclusion that it must be disregarded. Instead, viewing the evidence in the light most favorable to the government, as we must, we credit her testimony. *Cf. United States v. Payton*, 159 F.3d 49, 56 (2d Cir.1998) ("The ultimate question is not whether *we believe* the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find.*").

We are additionally aware that the district court was troubled by the agent's comment that her testimony reflected her "understanding" of what Reyes said. We agree with the trial court's reservations to the extent that police testimony with respect to a defendant's admissions is most

helpful to the factfinder if it consists of the exact question asked and response given. Yet, inasmuch as witnesses are human, it is not unusual for memories to fade or for responses to questions to lack precision. Perfect testimony is not always possible, but that alone is not grounds for disregarding statements made by a witness under oath. *See* 1 McCormick on Evidence § 10, at 42–43 (John W. Strong, ed., 5th ed.1999).

FBI Agent Helmer's frank admission that she was unable to remember the words used, while admittedly exasperating to the district court, may even have served a useful purpose. By testifying to her "understanding," she put the jury on notice that she was not purporting to recite the conversation verbatim. If anything, this would have benefitted defendant. If the jury believed Agent Helmer was exaggerating or remembering things incorrectly, then it could discredit her testimony. Nonetheless, in light of the procedural posture in which this case comes before us, that is, review of a judgment of acquittal under Rule 29, we must view all the evidence in the light most favorable to the government. Consequently, we are obligated to credit Agent Helmer's testimony and construe it most favorably to the government and in so doing reverse the granting of the Rule 29 motion of acquittal.

## CONCLUSION

Accordingly, for the reasons stated, the judgment of acquittal is reversed and the case is remanded to the district court for reinstatement of the jury's verdict.