UNITED STATES of America

v.

Viktor KOZENY and Frederic Bourke, Jr., Defendants.

No. 05 Cr. 518(SAS).

United States District Court, S.D. New York.

July 6, 2009.

Harold A. Haddon, Esq., Saskia A. Jordan, Esq., Haddon Morgan Mueller Jordan Mackey & Foreman P.C., Denver, CO, John D. Cline, Esq., K.C. Maxwell, Esq., Jones Day LLP, San Francisco, CA, James David Reich, Jr., Esq., Christopher Paolella, Esq., Winston & Strawn LLP, New York, NY, for Defendant Bourke.

## OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge.

### I. INTRODUCTION

Defendant Frederic Bourke moves pursuant to Federal Rule of Criminal Procedure 29 for an entry of a judgment of acquittal. For the reasons that follow, his motion is denied.

### II. BACKGROUND

The Government's allegations in this case are complex, and it is unnecessary to recite them here. The relevant facts are as follows: SOCAR is the state-owned oil company of the Republic of Azerbaijan ("Azerbaijan").[1] In the mid-1990s, Azerbaijan began a program of privatization.[2] The program gave the President of Azerbaijan, Heydar Aliyev, discretionary authority as to whether and when to privatize SOCAR.[3] Bourke and others allegedly conspired to violate the FCPA by agreeing to make payments to Azeri officials to encourage the privatization of SOCAR and to permit them to participate in that privatization.[4]

### III. LEGAL STANDARD

To prevail on a Rule 29 motion, a defendant must show that "the evidence is insufficient to sustain a conviction."[5] "[A] de-

Harry Chernoff, Iris Lan, Assistant United States Attorneys, New York, NY, for the Government.

---

1. *See* Indictment of Frederic Bourke, Jr. ¶ 3.

2. *See id.* ¶ 4.

3. *See id.*

4. *See id.* ¶ 18.

5. Fed.R.Crim.P. 29(a).

fendant making an insufficiency claim bears a very heavy burden." [6] "The ultimate question is not whether [the court] believe[s] the evidence adduced at trial established the defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could so find." [7] "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." [8]

■ A court must grant a motion under Rule 29 "if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." [9] "But at the end of the day, 'if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'" [10]

In considering the sufficiency of the evidence, the court must "view all of the evidence in the light most favorable to the government." [11] A court must analyze the pieces of evidence not separately, in isolation, but together, in conjunction with one another. [12] Accordingly, a court must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from the others." [13]

"[T]he credibility of witnesses is the province of the jury, and [a court] simply cannot replace the jury's credibility determinations with [its] own." [14] "[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court." [15] Furthermore, "the jury's verdict may be based on entirely circumstantial evidence." [16] Because the jury is entitled to choose which inferences to draw, the Government, in presenting a case based on circumstantial evidence, "need not 'exclude every reasonable hypothesis other than that of guilt.'" [17] But

**6.** *United States v. Desena,* 287 F.3d 170, 177 (2d Cir.2002). *Accord United States v. Best,* 219 F.3d 192, 200 (2d Cir.2000).

**7.** *United States v. Espaillet,* 380 F.3d 713, 718 (2d Cir.2004). *Accord Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**8.** *United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir.1999) (quotation marks and citation omitted). *Accord United States v. MacPherson,* 424 F.3d 183, 187 (2d Cir.2005).

**9.** *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984).

**10.** *United States v. Cassese,* 428 F.3d 92, 99 (2d Cir.2005) (quoting *United States v. Glenn,* 312 F.3d 58, 70 (2d Cir.2002)) (ruling on a Rule 29 motion).

**11.** *United States v. Aleskerova,* 300 F.3d 286, 292 (2d Cir.2002); *United States v. Reyes,* 302 F.3d 48, 52 (2d Cir.2002).

**12.** *See United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000).

**13.** *Guadagna,* 183 F.3d at 130. *Accord Reyes,* 302 F.3d at 53 ("[W]e consider the evidence as a whole.").

**14.** *United States v. James,* 239 F.3d 120, 124 (2d Cir.2000). *Accord Autuori,* 212 F.3d at 114 (a court "may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury"). Moreover, a court must "credit[ ] every inference that the jury might have drawn in favor of the [G]overnment." *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998).

**15.** *United States v. McDermott,* 245 F.3d 133, 137 (2d Cir.2001).

**16.** *United States v. Dae Whan Kim,* 435 F.3d 182, 184 (2d Cir.2006).

**17.** *Guadagna,* 183 F.3d at 130(quoting *Holland v. United States,* 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1954)); *Reyes,* 302 F.3d at 56(by "discount[ing] evidence of guilty knowledge entirely because there were possible ... innocent explanations for [defendant's] conduct," the district court "failed to view the evidence in the light most favorable to the [G]overnment"); *Autuori,* 212 F.3d at 114 ("[T]he [G]overnment need not negate every theory of innocence.").

"a conviction based on speculation and surmise alone cannot stand."[18] Moreover, a "jury is entitled to a vast range of reasonable inferences, but may not base a verdict on mere speculation."[19]

## IV. DISCUSSION

### A. Count Two—Money Laundering Conspiracy

Bourke argues that the Government has presented no evidence (1) "showing that [he] entered into any agreement with the specific intent of transporting money overseas for the purpose of promoting a violation of the FCPA;" and (2) "demonstrating that the scope of any such conspiracy extended into the statute of limitations period."[20] I will address each of these arguments in turn.

### 1. Lack of Intent

■ Bourke contends that the Government has failed to prove that Bourke's intent in agreeing to transfer money overseas was to violate the FCPA rather than to purchase vouchers and options, which he notes is lawful.[21]

As an initial matter, there is no dispute that Bourke invested in Oily Rock in March and July 1998.[22] In order to sustain the money laundering conspiracy charge against Bourke, the Government must present evidence that Bourke had the "knowledge or awareness of the illegal nature of the charged activity and [that he intended] to advance the illegal objective."[23] After a review of the evidence admitted at trial, I conclude that a reasonable jury could draw the inference that Bourke agreed with others that the intended use of his investment would be, in part, for the purpose of bribing Azeri officials.

Hans Bodmer, attorney to co-defendant Viktor Kozeny during the period of the privatization scheme, testified that he had a conversation with Bourke in early February 1998 regarding the bribery of Azeri officials.[24] Bodmer testified that during one trip to Azerbaijan, Bourke asked him, "what is the arrangement, what are the Azeri interests."[25] After obtaining Kozeny's approval to speak to Bourke about the specifics of the "arrangement," Bodmer then met with Bourke the following day.[26] He testified that he then told Bourke that two-thirds of the vouchers had been issued to the Azeri officials under credit facility agreements at no risk to them.[27] He also identified the Azeri offi-

---

18. *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994).

19. *United States v. Wilson*, 160 F.3d 732, 737 (D.C.Cir.1998) (quotation marks and citation omitted).

20. Preliminary Memorandum of Law in Support of Defendant Frederic Bourke, Jr.'s Motion for Entry of a Judgment of Acquittal Pursuant to Fed R.Crim. P. 29 ("Bourke Mem.") at 1.

21. *See id.* at 5.

22. *See* Trial Transcript ("Tr.") at 2555:6–9 (Christopher Paolella, defense counsel, acknowledging at oral argument that the dates

of Bourke's investment were March and July 1998). *See also id.* at 1063:11–22(Bodmer explaining that Bourke had invested in Oily Rock in March and July 1998). Oily Rock was the organization that was established to purchase vouchers on behalf of Bourke and his co-investors in Azerbaijan. *See id.* at 400:25–401:3.

23. *United States v. Svoboda*, 347 F.3d 471, 479 (2d Cir.2003).

24. *See* Tr. at 1065:7–1070:23.

25. *Id.* at 1065:15–16.

26. *See id.* at 1067:3–21.

27. *See id.* at 1068:23–1069:10

cials who received these vouchers as Barat Nuriyev and his family and Nadir Nasibov and his family.[28] It would certainly be reasonable for the jury to conclude that Bourke was aware of the bribery arrangements as early as February 1998.

In addition to Hans Bodmer, the Government also called Thomas Farrell, one of Kozeny's employees, as a witness. Farrell testified that some time after Bourke had invested in Oily Rock, Bourke requested that Farrell leave his office with him so that they might have a conversation.[29] During that conversation, Bourke asked about the status of the privatization venture and whether President Aliyev or Barat Nuriyev had given any indications to Farrell about possible approval.[30] Farrell testified that at one point in the conversation, Bourke had asked: "Has Viktor given them enough money?"[31]

Farrell testified that Bourke raised the subject with him a second time during a trip to celebrate the opening of the Minaret offices in Baku, Azerbaijan in April 1998.[32] Farrell testified that Bourke asked him about privatization and whether Farrell had heard anything from the officials in charge, such as Nuriyev.[33] After Farrell gave Bourke a short status report, Bourke asked: "Well are-is Viktor giving enough to them?"[34]

The testimony of Bodmer and Farrell, when considered in the light most favorable to the Government, is sufficient to prove beyond a reasonable doubt that Bourke agreed and intended that his investment not only be used for the purpose of purchasing vouchers and options, but also to ensure that the privatization of SOCAR occurred, by bribing the officials involved in the decision-making process. At oral argument, Bourke argued that proof that he knew that the investment money was being used partly to bribe officials is not enough; intent is required to sustain a conviction for conspiracy.[35] However, even if *Bodmer's testimony* shows only *knowledge* of the bribery arrangements, a reasonable jury could infer from *Farrell's testimony* of Bourke's statements that Bourke *intended* that part of his July 1998 investment money be used to bribe officials.[36]

28. *See id.* at 1069:22–1070:3. Nasibov was the Chairman of the State Committee for Property in Azerbaijan. *See id.* at 321:10–15; 444:18–19. Nuriyev was his deputy. *See id.* at 427:17–18.

29. *See id.* at 518:23–519:8.

30. *See id.* at 519:15–519:22.

31. *Id.* at 520:1.

32. *See id.* at 535:23–536:16. Minaret was an investment bank that Kozeny had established in Azerbaijan. *See id.* at 400:8–16.

33. *See id.* at 536:18–23.

34. *Id.* at 536:24–26.

35. *See id.* at 2555:22–2556:10.

36. Neither *United States v. Brown*, 186 F.3d 661 (5th Cir.1999), nor *United States v. Miles*, 360 F.3d 472, 477 (5th Cir.2004), are of any help to Bourke. In *Brown*, the Fifth Circuit held that "[i]n examining the question of intent necessary for a money laundering promotion conviction, [] the Government must present either direct proof of an intent to promote such illegal activity or proof that a given type of transaction, on its face, indicates an intent to promote such illegal activity." *Brown*, 186 F.3d at 670–71. The court ruled that in the absence of direct proof, the defendant could not be convicted for using funds procured by fraud to pay the operating expenses of an "otherwise legitimate business enterprise." *See id.* at 671. The court reiterated these holdings in *Miles*. *See Miles*, 360 F.3d at 477. Here, by contrast, there is direct proof of Bourke's intent. Moreover, Bourke is charged only with a conspiracy to launder money, not with the substantive offense of money laundering.

## 2. Expiration of the Statute of Limitations

Bourke next argues that even if he participated in a money laundering conspiracy, that conspiracy ended with his last investment in Oily Rock.[37] He contends that because his last transfer of funds occurred before July 22, 1998, "the money launder[ing] charge is barred by the statute of limitations."[38]

In the Court's June 21, 2007 Opinion and Order and subsequent Memorandum Opinion and Order on Bourke's motion to dismiss, I held that the Government had alleged—with respect to the money laundering conspiracy count—conduct occurring within the limitations period, which is after July 22, 1998.[39] However, I also noted that "[w]hether the government ultimately will be able to prove that the [alleged money laundering] conspiracy continued past July 1998 is an issue for trial."[40]

As noted above, the Government has offered sufficient evidence for a reasonable jury to conclude that a money laundering conspiracy existed and Bourke willfully joined and participated in that conspiracy. The key question therefore is whether the conspiracy continued after July 22, 1998.

The Second Circuit has held that

where a conspiracy statute does not require proof of an overt act and where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has been terminated[,] and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn.[41]

The Supreme Court has ruled that a conviction for conspiracy to engage in money laundering in violation of Section 1956(h) of Title 18 of the United States Code does not require proof of an overt act.[42] In addition, the conspiracy here, whose purpose is to violate the FCPA, contemplates a continuity of purpose and continued performance of acts. As such, to prove that the claim is time-barred, Bourke must show either that the conspiracy was terminated, or that Bourke withdrew.[43]

Bourke does not contend that he withdrew from the conspiracy by July 22, 1998.[44] Instead, he argues that the conspiracy must have terminated by July 22, 1998 because "the object of the conspiracy here was to transport funds for the intent of violating the Foreign Corrupt Practices Act."[45] He further contends that viewing the object of the conspiracy as simply the violation of the FCPA would "conflate" the money laundering conspiracy with the conspiracy to violate the FCPA.[46]

---

**37.** *See* Bourke Mem. at 8.

**38.** *Id.*

**39.** *See United States v. Kozeny*, 493 F.Supp.2d 693, 714 (S.D.N.Y.2007).

**40.** *Id.* at 715.

**41.** *United States v. Spero*, 331 F.3d 57, 60 (2d Cir.2003).

**42.** *See Whitfield v. United States*, 543 U.S. 209, 219, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005).

**43.** Although the burden of proof is on the Government to prove that the conspiracy continued past July 22, 1998, in order for Bourke

to prevail on his Rule 29 motion with respect to this Count, he must make an affirmative showing that the conspiracy was either terminated or he withdrew from the conspiracy by that date.

**44.** In fact, Bourke confirmed to the Court at the June 30, 2009 charge conference that withdrawal from either of the conspiracies is not one of his defenses. *See* Tr. at 2946:16–25.

**45.** *Id.* at 2980:15–17.

**46.** *Id.* at 2980:18–23.

I disagree. In *United States v. Mennuti*, the Second Circuit examined whether the statute of limitations had expired on a count for conspiracy to commit mail fraud.[47] The court found that the "crucial question" for statute of limitations purposes is "the scope of the conspiratorial agreement," which must be informed by the purpose of the conspiracy.[48] It also held that where the object of the conspiracy is economic, the conspiracy "continues until the conspirators receive their anticipated economic benefits."[49] The court therefore rejected Mennuti's argument that the conspiracy ended when the insurance check was acquired.[50] Instead, it reasoned that Mennuti's "sole reason for becoming involved in the scheme was to purchase [a real estate] property at a low cost and then resell it at a profit."[51] As such, the conspiracy did not end when he acquired the check; it ended when he purchased the property.[52]

■ Applying the reasoning of *Mennuti* to the instant case makes clear that the conspiracy here was economic. According to the Indictment, the purpose or intent of transporting the funds was to violate the FCPA. However, a person does not violate the FCPA without expecting to receive something in return. In this case, the Government contends that the conspirators bribed the officials in order to encourage the privatization of SOCAR and reap substantial returns on their voucher investments. Contrary to Bourke's argument, a reasonable jury could infer that the conspiracy had not terminated by July 22, 1998, because the privatization had not occurred at that time and no returns had been made on the investments.

In fact, Bourke himself made his final investment in July 1998 in further anticipation of the success of the privatization venture. There is also evidence that investments in Oily Rock were still being made in August 1998,[53] and that bribes were being paid in August and September 1998.[54] This evidence provides a reasonable basis for a jury to infer that the conspiracy continued past July 22, 1998.

Bourke relies principally on *United States v. Roshko*[55] for his argument that the object of the conspiracy here was "nar-

---

47. 679 F.2d 1032, 1035 (2d Cir.1982).

48. *Id.*

49. *Id.* The Second Circuit reiterated these holdings in a subsequent money laundering case pursuant to section 1956(h). *See United States v. La Spina,* 299 F.3d 165, 173–76 (2d Cir.2002).

50. *See Mennuti,* 679 F.2d at 1035.

51. *Id.*

52. *See id.*

53. *See* GX 186(Transfer statement notifying Oily Rock that a payment was made by Richard Friedman to Oily Rock's account at Hyposwiss for one million dollars on August 8, 1998).

54. *See id.* at 574:18–575:13(Farrell's testimony that efforts were expended in 1998 to obtain a doctor's appointment and a visa for Nuriyev to travel to the United States to see that doctor); *id.* at 583:1–17 (Farrell's testimony regarding an entry in his calendar that reflects Bourke's help in obtaining a doctor's appointment and visa); GX 822(8/14/98 Letter from Farrell to Bourke regarding Nuriyev's medical treatment in the United States). *See also id.* at 1121:4–1123:19 (Bodmer's testimony that from May 1, 1998 to September 29, 1998, a number of payments were made from Oily Rock accounts to Azeri officials); *id.* at 1122:2–16 (Bodmer's testimony that the latest payment was for one million dollars and was transferred from Oily Rock funds to an account of Cassopolis Enterprises, which was associated with the daughter of President Aliyev); GX 261–N (showing the date of the transfer as September 29, 1998 and the amount of the transfer to be $1,000,000).

55. 969 F.2d 1 (2d Cir.1992).

rowly and specifically framed"—to transport money for the purpose of violating the FCPA.[56] However, *Roshko* involved a conspiracy to obtain a green card, and the Second Circuit distinguished its facts from the facts of an economic conspiracy case, specifically discussing with approval its reasoning in *Mennuti*.[57]

Finally, Bourke contends that tying the money laundering conspiracy to the underlying substantive violation "would render the statute of limitations essentially indeterminate."[58] That is not the case here. It would be reasonable to conclude that the conspiracy ended when Kozeny and his co-conspirators abandoned their attempts at encouraging the privatization of SOCAR or when they ceased paying bribes to Azeri officials. Accordingly, Bourke's motion is denied with respect to Count Two.

### B. Count One—Conspiracy to Violate the FCPA and Travel Act

■ Bourke next argues that he should be acquitted of Count One because "[n]o rational juror could find beyond a reasonable doubt that the post-July 22, 1998 payments (and other alleged overt acts) furthered the FCPA conspiracy, as opposed to the options fraud conspiracy."[59] Bourke argues that by July 1998, the privatization venture was a "pipe dream," but

that the options fraud conspiracy continued at "full speed."[60] Bourke further notes that it would be "nothing but 'speculation and conjecture' to conclude that any such payments furthered the FCPA conspiracy—and that cannot be the basis for finding guilt beyond a reasonable doubt."[61]

However, there is ample evidence to suggest that the purpose of many of the payments was to obtain assistance from the Azeri officials in the privatization venture. Farrell testified that bribes had been paid to the officials for the purpose of "help[ing] us purchase and obtain vouchers and options to [use in the] privatization auction."[62] There is also testimony connecting specific bribes to the privatization venture.[63] For instance, Farrell testified that at the meeting in which Kozeny agreed to give the officials a two-thirds share of the vouchers, he had also agreed to pay an "entry fee" of eight to twelve million dollars to President Aliyev in order to participate in the privatization of SOCAR, which was subsequently transferred in cash and by wire.[64] A reasonable jury could properly conclude that any bribes made after July 22, 1998 were also made for the purpose of encouraging privatization rather than facilitating Kozeny's options fraud scheme.

---

56. *See* Supplemental Memorandum of Law in Further Support of Defendant Frederic Bourke, Jr.'s Motion for Entry of a Judgment of Acquittal Pursuant to Fed.R.Crim.P. 29 ("Bourke Supp. Mem.") at 7.

57. *See Roshko*, 969 F.2d at 8.

58. *See* Bourke Supp. Mem. at 4–5.

59. Bourke Mem. at 11.

60. *Id.* at 14.

61. *Id.* at 16.

62. Tr. at 353:14–16.

63. And even if there is no testimony connecting some of the bribes to the privatization venture, all bribes and payments made prior to April 1998 would have necessarily been for the purpose of encouraging the privatization venture rather than facilitating the options fraud scheme. This is because a reasonable jury could infer that the options fraud scheme began only when Omega Advisors made its first investment. *See* Tr. at 549:16–551:7 (Farrell testifying that Kozeny violated the co-investment agreement with Omega Advisors by selling Oily Rock's own options to Omega); GX152 (co-investment agreement with Omega dated April 1998).

64. *See id.* at 436:8–437:25.

Bourke's argument is also unpersuasive for another reason. As noted, there is sufficient evidence from which a reasonable jury could infer that Bourke knew of payments being made to Azeri officials by February 1998 and that he intended for similar payments to be made as of April 1998. In addition, there is evidence that he was involved in referring Nuriyev to a doctor in the United States and obtaining a visa for him to travel to the United States in August 1998.[65] But there is also evidence that Bourke had no knowledge of the options fraud scheme until later—sometime around October 1998.[66] It would therefore be plausible for a jury to infer that the purpose of the bribes—including some that were made after July 22, 1998—was to encourage the privatization of SOCAR, in which Bourke participated, rather than to facilitate the options fraud scheme, of which Bourke had no knowledge. Because this inference is supported by the evidence, it would not be the result of "speculation or conjecture." Bourke's motion with respect to Count One must therefore also be denied.

### C. Count Three—False Statements Charge

■ Finally, Bourke challenges the sufficiency of the evidence with respect to the false statements charge. He argues that the statements he made to federal authorities during his proffer sessions are "ambiguous" and that when viewed "in context and as a whole, no rational juror could find beyond a reasonable doubt that [ ] Bourke knowingly and willfully made a materially false statement."[67]

However, when the evidence is viewed as a whole, a reasonable jury could find that a number of statements made by Bourke are flatly contradicted by the testimony of Farrell and Bodmer. For instance, Agent George Choundas, the FBI special agent who interviewed Bourke in April and May 2002,[68] testified that Bourke was asked whether he had any conversations with Bodmer or Kozeny regarding a scheme to influence Azeri officials.[69] Bourke had answered: "no, because I didn't think there were any."[70] However, as noted, Bodmer testified that Bourke had approached him in February 1998 about an "arrangement" with the Azeri officials, and that Bodmer had then explained to Bourke how the Azeri officials were to receive a two-thirds share of the vouchers for essentially no consideration.[71]

Agent Choundas also testified that Bourke was specifically asked whether—by April 1998 and the opening of the Minaret offices in Baku, Azerbaijan—he had reason to suspect that Kozeny was paying bribes to Azeri officials.[72] Bourke had answered no.[73] Bourke was subsequently

---

65. *See id.* at 574:18–575:7(Farrell's testimony regarding Bourke's efforts at securing doctor appointment and visa); GX822 (8/14/98 Letter).

66. *See* Tr. at 1177:2–1178:6(Bodmer testifying that he met with Bourke in October 1998, and that Bourke had informed him that he had discovered Kozeny's options fraud scheme); *id.* at 738:13–740:22(Farrell testifying that Bourke had met with Aliyev in October 1998 to report that Farrell and Kozeny were "crooks" and then had met with Farrell and Kozeny and had accused them of cheating investors).

67. Bourke Mem. at 17.

68. *See* Tr. at 2449:5–10(Choundas testifying that he was a special agent with the FBI from 1999–2004); *id.* at 2453:20–21(testifying that the interviews of Bourke took place in April and May 2002).

69. *See id.* at 2465:25–2466:2.

70. *Id.* at 2466:5–6.

71. *See id.* at 1065:7–1070:13.

72. *See id.* at 2458:11–16.

73. *See id.* at 2458:17–18.

asked whether by April 1998 he had been given any indication that "anything untoward relating to the investment was going on." [74] Again, he responded no.[75] However, such statement is belied by the testimony of Farrell and Bodmer that they both had conversations with Bourke by April 1998 about payments to the Azeri officials.[76]

Bourke's argument that he had not made a false statement because he "expressly stated his belief that Kozeny was 'paying off Azeri officials' (including Nuriyev) as part of the options fraud scheme" is of no moment.[77] As noted, a reasonable jury could find, based on the evidence offered at trial, that Bourke had no knowledge of the options fraud scheme until approximately October 1998. Therefore, Bourke's statement that Kozeny was bribing officials in furtherance of Kozeny's options fraud scheme would not explain Bourke's denial of knowledge of the bribery that had already occurred by April 1998. Bourke's motion with respect to Count Three is denied.

## V. CONCLUSION

For the reasons set forth above, Bourke's Rule 29 motion is denied in its entirety. The Clerk of the Court is directed to close this motion (document no. 221).

SO ORDERED.

---

74. *Id.* at 2458:19–22.

75. *See id.* at 2458:23–24.

76. *See id.* at 1065:7–1070:13 (Bodmer's testimony); *see id.* at 519:13–520:7; 536:14–537:1 (Farrell's testimony).

77. *See* Reply Memorandum of Law in Further Support of Defendant Frederic Bourke, Jr.'s Motion for Entry of a Judgment of Acquittal Pursuant to Fed R.Crim. 29 at 4.